**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 20 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

—————————————

DENNIS BORGIALLI,

    Plaintiff-Appellant,

v.

THUNDER BASIN COAL CO.,
ATLANTIC RICHFIELD CO.,
THUNDER BASIN COAL CO. L.L.C.,

    Defendants-Appellees.

No. 99-8009

—————————————

Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 98-CV-1009-D)

—————————————

Before **LUCERO**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge,
and **BROWN**, Senior District Judge.[*]

—————————————

Timothy W. Miller, Reeves & Miller, Casper, Wyoming, (Jeremy D.
Michaels, Michaels & Michaels, Gillette, Wyoming, with him on the
briefs) for Plaintiff-Appellant.

Gary R. Scott, Hirst & Applegate, P.C., Cheyenne, Wyoming, for
Defendants-Appellees.

—————————

**BROWN**, Senior District Judge.

—————————

    Plaintiff Dennis Borgialli claims that his former employer,
the Black Thunder Mine in Gillette, Wyoming, (hereafter referred to
as the "Mine") terminated his employment in violation of the
Americans with Disabilities Act, 42 U.S.C. §12101 et seq, and in

—————————————————————

[*]Honorable Wesley E. Brown, Senior United States District
Judge for the District of Kansas, sitting by designation.

violation of Wyoming state law. [1] The district court entered summary judgment for the defendants on all claims, and plaintiff has appealed this order. [2] We exercise jurisdiction under 28 U.S.C. §1291 and affirm.

## BACKGROUND

There is no real factual dispute between the parties as to the events which led to the termination of plaintiff's employment at the Mine. For this reason, we refer to the record and various factual findings made by the trial court in its ruling on the motion for judgment.

Plaintiff worked as a "blaster" for eighteen years at the Mine. During his employment, plaintiff received frequent praise for his outstanding performance and safety record. His blasting job included varied tasks such as drilling holes up to 12-1/4" in diameter and 240 feet in depth, operating vehicles for transporting explosive materials, and the placement and detonation of large amounts of explosives. As a part of his job, plaintiff operated vehicles and other equipment in dangerous geographical areas such as work in close proximity to high walls with shear drop-offs. Plaintiff's duties also included a specific responsibility "for

---

[1] The Mine was operated by defendants Thunder Basin Coal Company, Atlantic Richfield Company, and the Thunder Basin Coal Company, L.L.C.

[2] Plaintiff's state claims were based upon alleged violation of the Wyoming Fair Employment Practices Act, and the allegation that defendants had breached an implied contract of employment, requiring "cause" for termination.

2

personal safety, as well as [the] safety of other personnel in and around drilling and blasting locations. . . ."[3]

The explosives used at the Mine were of the type used in the Oklahoma City bombing, a fertilizer-diesel mixture. In his deposition, plaintiff described the massive effect of each blast in this manner:

> A. We use AMFO. It's a fertilizer-diesel mixture, along with the detonator -- I'm not sure what they're made out of -- to set the explosion off, as well as primer cord. And the amount is usually in the millions of pounds.
>
> Q. Per blast?
>
> A. Per blast, which is quite massive.
>
> Q. How would that compare, for instance, with the Oklahoma City bombing as far as the amount and kind of explosive used in that blast?
>
> A. If my memory serves me right, in Oklahoma City, it was about 2,000 pounds.
>
> Q. Of the same kind of explosive?
>
> A. Yes. . . And that would fill one hole about half full.
>
> Q. And how many holes are you working with on a blast?
>
> A. Anywhere from 200 to 800 holes. (Appendix at p. 199).

---

[3] Plaintiff's written job description is found in Appellant's Appendix, at pp. 120-123. The explosives used at the Mine were of the type used in the Oklahoma City bombing, a fertilizer-diesel mixture, and the amount used per blast was "usually in the millions of pounds." (Appendix at p. 199)

In early 1996, plaintiff's work environment changed because his former subordinate, John Opseth, became his supervisor. These two men apparently had a contentious relationship dating back at least to 1995. Beginning in March, 1996, plaintiff began having problems with dizziness, blurred vision and nausea. In the following months, plaintiff saw several different physicians for these symptoms, and their medical opinions ranged from multiple sclerosis to depression to closed head injury to some type of medication reaction. It was finally determined that many of plaintiff's physical problems were caused by migraine headaches. On May 6, 1996, plaintiff received a restricted medical release signed by Dr. Mitchell Horan who wrote that, because of visual symptoms and dizziness, plaintiff should not be permitted to drive heavy equipment. Plaintiff concedes that as of May 22, 1996, he was not able to return to his job as a blaster. (Appendix at 100, 101). Dr. Horan testified that if plaintiff had been allowed to return to work in June, 1996, he would have contacted the Mine to advise that he should not be working because of dizziness problems. It was Dr. Horan's opinion that plaintiff should not have been allowed to return to work at any time before mid to late August, 1996. (Appendix at 189, 190).[4]

The Mine allowed plaintiff to return to full capacity as a blaster within a few days after receiving work releases signed by

_____

[4] The trial court found that plaintiff's work was "both involuntarily and voluntarily restricted through the summer of 1996."

4

Dr. Sabow on July 31, 1996, and a release signed by Dr. Farrell on August 12, 1996. (Appendix at pp. 77-85, 99). Plaintiff returned to work on August 16, 1996.[5]

On September 23, 1996, Mr. Opseth gave plaintiff a negative performance evaluation. (Appendix pp. 364-313). [6] Plaintiff believed that this evaluation was false, and he was also upset about being kept away from work during the summer. On the night of September 23, 1996, plaintiff admittedly had thoughts of suicide, and he telephoned his former supervisor, Mr. Bill Babcock, expressing those suicidal feelings. The next day, plaintiff visited the Mine's nurse, Ms. Barbara Hagerman, and told her of his suicidal thoughts. He suggested that the Mine should be concerned about his safety.[7] On September 24, 1996, after being sent home from work, plaintiff went to see Darryl Lynde, his counselor at work. (Appendix at 109). At that time a "Statement of Injury Form" was signed by Mr. Lynde containing this notation:

---

[5] With respect to plaintiff's migraine headaches, it was Dr. Sabow's opinion that plaintiff "is quite capable of returning to work. I do not consider him to be at any risk to himself or to others with his present condition." (Appendix, at p. 84)
Dr. Ferrell agreed with Dr. Sabow's opinion. (Appendix at p. 85).

[6] Opseth gave plaintiff 274 total points, which was not sufficient to maintain plaintiff in a position of "Tech. VI."

[7] In conversations with supervisors on that date, plaintiff voiced a concern that "he wasn't sure if he was going to hurt someone or hurt himself." (Appendix at 197).
According to Ms. Hagerman's notes, plaintiff was reported as stating ". . . If you think I was unsafe before, you should see how unsafe I am now . . . . " (Appendix at 173).

> I saw Dennis 9/24/96 for one hour. He agreed
> to an absolute "NO HARM" contract w/wife &
> therapist present he agreed to keep himself
> safe from himself now & forever. (Appendix at
> 127)

On this form, there was a provision for the counselor's opinion as to whether plaintiff was able to return to work. This portion of the form was not completed by Mr. Lynde. (Appendix at 127) [8]

On September 25, plaintiff called in to say he could not work because of a migraine headache. On September 26, plaintiff took the return to work form he had obtained from Lynde to the Mine and he worked on that day. At the conclusion of his work shift, plaintiff was told that the Mine had concerns about the release form since Lynde did not indicate that plaintiff was able to return to work. Plaintiff was told that the company would make arrangements for his evaluation by a psychiatrist. (Appendix at 201-203). Plaintiff understood that he would not be returning to work until that evaluation was made. (Appendix at 112).

On October 11, 1996, plaintiff was evaluated by a Denver psychiatrist, Dr. Peter Silvestri. Following a review of plaintiff's medical records and a personal three-hour interview, Dr. Silvestri found that plaintiff could not safely perform his job as a blaster. In his report, the doctor found that plaintiff suffered from several psychiatric disorders, including major depression together with somatization, anxiety, and personality

---

[8] In regard to this agreement, plaintiff stated he was not going to harm himself. As noted, Lynde did not specifically answer the question concerning plaintiff's ability to return to work.

disorders. (Appendix 163). He also found that plaintiff suffered from several physical problems including "complex basilar migraine headaches," possible multiple sclerosis and "benign familial tremor." Dr. Silvestri also mentioned plaintiff's conflict with Mr. Opseth and recommended that plaintiff avoid "personal and work related interactions with persons known to exacerbate his symptoms (such as Mr. Opseth)." It was also noted that plaintiff's psychiatric problems are "chronic, and rapid improvement in his habitual style of interaction should not be expected." (Appendix at 175, 176).

Dr. Silvestri's report, which was sent to Dr. David Clyde, defendants' medical director, conveyed the following conclusions: (Appendix at 175):

> It is my opinion that Mr. Borgialli does suffer from psychiatric disorders and that these disorders make it impossible for him to perform his current job safely. He requires treatment for these disorders.
>
> It is also my opinion that Mr. Borgialli suffers from one or more non-psychiatric medical disorders, and that he requires treatment for these disorders. Both the symptoms of these disorders, and the possible adverse effects of necessary treatment also make it impossible for him to safely perform the duties of his current job on the blasting crew.[9]

---

[9] In his deposition, Dr. Silvestri testified that his decision that plaintiff could not safely perform his job was not even a "close call". (Appendix at p. 157).
He stated that plaintiff's emotional responses (a tendency to somatize painful emotions) "could lead to actions that might be dangerous for him or for others", and that his physical symptoms such as dizziness and blurred vision could "also aggravate or lead to a further degree of dangerousness".

7

On November 21, 1996, following receipt of this medical report, Dr. Clyde issued a Memorandum to Mine officials with suggestions concerning plaintiff's continuing employment:

> Based upon this independent Medical Evaluation [from Dr. Silvestri] and review of the information from other treating physicians, this employee cannot return to a job as "blaster" at the mine. <u>He presents a direct safety threat to himself and to the other workers.</u> I recommend that Management and Human Resources evaluate this employee's qualifications for other positions in the company with the following limitations: 1) No work in areas that require good balance, depth perception, and vision to work safely (e.g. no work at heights or driving machinery). 2) No work with machinery that requires the employee to remain mentally alert (He is taking medications that can impair reaction time and cause a safety hazard), and 3) Provide work in a small, stable work group that would allow limited interpersonal interaction. (Appendix at 220)(Emphasis supplied)

After receipt of Dr. Clyde's Memorandum, John Kasper, the Human Resource Manager at the Mine, met with plaintiff and others concerning Dr. Clyde's recommendations. Other possible job opportunities for plaintiff in defendant's operation were discussed. [Appendix at pp. 205-208] At that time there were three full-time positions open -- for Plant Maintenance Technician, Shop Maintenance Technician, and Engineering Supervision. These openings were discussed with plaintiff, but he was not qualified by education, training, or experience for any of these positions.

---

Dr. Silvestri found that plaintiff's job on the blasting crew was "inherently dangerous," and that all of the factors led him to reach his conclusion that plaintiff "could not perform his current job safely." (Appendix at p. 164).

8

There was also one temporary position in the warehouse, which was unsuitable since the job would have required working on ladders.

Mr. Kasper provided plaintiff with an outline, dated December 11, 1996, of his medical and disability benefits. [Appendix pp. 392-395]. This information included the fact that plaintiff's full base pay benefits had been exhausted on August 12, 1996, and that his "half base pay" benefits would be exhausted on December 30, 1996:

> Because you will exhaust your Sickness/Disability benefits on 12/30/96, and medical restrictions prevent you from returning to work, you will be placed on a Disability Leave of Absence effective 12/31/96. This leave will be for a period of one year, pending approval for Long Term Disability benefits. At the end of one year, if you are in receipt of LTD benefits, your leave will be converted to a Long Term Disability Leave of Absence. (Ibid. at p. 392).[10]

Mr. Kasper further informed plaintiff of time limitations governing an application for long term disability benefits:

> Your disability waiting period is estimated to be fulfilled about December 20, 1996, at which time you could be eligible for LTD benefit payments of 50% of your regular base pay.. . . You have been provided the LTD application forms necessary to apply for this benefit, but you have not completed and returned them as of this date. I sincerely encourage you to apply for your LTD benefits -- if you need another set of the application forms, please let me know. (Ibid. at 393)

---

[10] During the course of the "Disability Leave of Absence," plaintiff's medical and dental insurance coverage and basic life insurance continued.

9

Plaintiff continued on half-pay status until the end of December, 1996 (Appendix at 114).  In March, 1997, he sought an evaluation from Dr. Mark Vuolo, another psychiatrist.  In a report dated March 29, 1997, Dr. Vuolo diagnosed plaintiff's condition to include Undifferentiated Somatoform Disorder, Depressive Disorder NOS, in remission, Anxiety Disorder NOS, in remission, and Possible Personality Disorder NOS (with dependent and obsessive-compulsive traits).  In addition Dr. Vuolo found that plaintiff had several physical problems including basilar migraine syndrome, cervical degenerative disc disease, and familial tremor.  (Appendix at 137)

Dr. Vuolo concluded his report in this manner:

> Finally, my present psychiatric assessment does not indicate that Mr. Borgialli is currently impaired in his capacity to perform the cognitive or physical tasks involved in this job as a mine blaster. Furthermore, his psychiatric illness is not assessed to be of sufficient severity to cause long-term occupational disability. . . .
> * * * *
> It is difficult to give a precise prognosis for Mr. Borgialli's psychiatric response to his hopeful return to the work place. Hopefully, the recommended treatment could significantly reduce his possible tendency toward somatization and therefore minimize the amount of time used in sick leave. However, it is difficult to imagine in the near future that.... [he] will have improved his adjustment capacity sufficiently to successfully manage a relationship with Mr. Opseth as his supervisor. [Emphasis supplied, (Appendix at pp. 137-138).[11]

---

[11]  At the time Dr. Vuolo wrote his report, he was not aware that safety was an issue in the decision to return plaintiff to work.  He stated that "I didn't realize that that was the paramount issue, anyway." (Appendix at 181).

10

When Dr. Vuolo's report was sent to the Mine with plaintiff's request to return to work, defendants determined that plaintiff would need to be seen by a third psychiatrist since the opinions of Doctors Silvestri and Vuolo conflicted in part. Plaintiff refused to be evaluated by another psychiatrist. Because an additional evaluation was refused, defendants terminated plaintiff, effective December 31, 1997.[12]

In this appeal, plaintiff denies that he was or is "disabled," as that term is defined under the ADA. Instead, he claims that defendants "perceived" him to be disabled and discriminated against him for this reason. The district court concluded that even if plaintiff were "disabled" the record clearly established that plaintiff posed a direct threat to others and thus was not a qualified person for employment as a blaster in the defendants' mining operation. Similar rulings were made by the district court regarding plaintiff's qualifications for employment under state law.

We review the grant of summary judgment *de novo*, with an examination of the record and all reasonable inferences which might be drawn from it in the light most favorable to the plaintiff. Woodman v. Runyon, 132 F. 3d 1330, 1337 (10th Cir. 1997). Following our review of the record, we determine that plaintiff

---

[12]  Plaintiff had one year to apply for long term disability, and, since he did not do so, he was officially terminated effective December 31, 1997.  (Appendix at 209).

11

failed to establish a prima facie case under the ADA or under state laws pertinent to his employment status.

The ADA prohibits employers from discriminating against qualified individuals with disabilities in regard to employment conditions. 42 U.S.C. §12112(a). In order to prevail on a claim under the ADA, a plaintiff must establish that he is a disabled person, that he is qualified for employment -- that is to say that he is still able to perform the essential functions of his job, with or without accommodation, and that the employer discriminated against him because of his disability. A person is considered disabled within the meaning of the ADA if he has "a physical or mental impairment that substantially limits one or more of [his] major life activities." 42 U.S.C. §12102(2)(A).

The first determination made by the district court in Borgialli's case concerned his status as a "disabled person." In this appeal, plaintiff denies that he is a "disabled" person under the ADA. Instead, he claims that the defendants "perceived" him to be disabled and discriminated against him on a "perceived disability." The record supports the finding of the district court that defendants had not "perceived" plaintiff to be disabled at any time prior to receiving Dr. Silvestri's report. The ADA does not apply to any time period when plaintiff was temporarily out of work from March, 1996, to July 31, 1996, due to migraine headaches and problems with dizziness and blurred vision. During this time, there is no evidence that defendants considered these symptoms to be long term or permanent; and, when the Mine received work

12

releases signed by two of plaintiff's physicians, they immediately returned plaintiff to full duty as a blaster. The ADA was not designed to apply to temporary conditions. See Bolton v. Scrivner, Inc., 36 F. 3d 939, 942, 943 (10th Cir. 1994).

The second occasion when plaintiff was not allowed to work followed Mr. Opseth's unfavorable job evaluation, and plaintiff's statements regarding safety concerns and suicidal thoughts on September 24, 1996. At that time, the Mine determined that plaintiff's presence in the workplace raised a definite safety concern, particularly when it was noted that Mr. Lynde had not affirmatively stated that plaintiff was able to return to work.

The Mine claims that it never considered plaintiff's physical or psychological problems to be permanent in nature because it "welcomed Mr. Borgialli's return once his health improved." The district court agreed with this argument "to a point":

> The first evidence that the Mine regarded Mr. Borgialli as impaired under the ADA is Dr. Clyde's memorandum. . . . Prior to this time, however, nothing in the record suggests that the Mine perceived [his] ailments as anything more than temporary conditions affecting his ability to perform the job of a blaster. The Court finds that summary judgment is appropriate insofar as Plaintiff has failed to show that prior to Dr. Clyde's memo he was "disabled" under the ADA. The Court finds, however, that Dr. Clyde's memorandum and the company's actions taken in response to the memo create a genuine issue of material fact regarding whether Plaintiff was "disabled" under the ADA. (Slip Opinion, pp. 8-9) (Emphasis supplied)

However, the district court further determined that even if plaintiff was entitled to the protections of the ADA after Dr.

13

Silvestri's report and the recommendations of Dr. Clyde, defendants were entitled to summary judgment because under the evidence there can be no liability under the ADA when plaintiff's condition is found to be a "direct threat" to others in the workplace.

Under the ADA it is a defense to a charge of discrimination if an employee poses a direct threat to the health or safety of himself or others. <u>Den Hartog v. Wasatch Academy</u>, 129 F. 3d 1076, 1088 (10th Cir. 1997).[13] Thus, 42 U.S.C. §12113(a), (b) provides the following defenses:

§12113. Defenses.

(a) In general

It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests or selection criteria that screen out. . . or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

(b) Qualification standards

The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.

A definition of the term "direct threat" appears in 42 U.S.C. §12111 (3) in this manner: "The term 'direct threat' means a significant risk to the health or safety of others that cannot be

---

[13] In <u>Den Hartog</u>, this court found that a teacher's psychotic son posed a direct threat to the school community and thus teacher's termination did not violate the ADA.

14

eliminated by reasonable accommodation." Federal Regulations, 29 C.F.R. §1630.2(r)(1998) expand upon the issue of "direct threat":

> (r) _Direct Threat_ means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. <u>This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence</u>. In determining whether an individual would pose a threat, the factors to be considered include: (Emphasis supplied)
>
> (1) The duration of the risk;
>
> (2) The nature and severity of the potential harm;
>
> (3) The likelihood that the potential harm will occur; and
>
> (4) The imminence of the potential harm.

While 42 U.S.C. §12113, quoted above, is focused on "Defenses" to ADA claims of discrimination, it seems that there may be a question of whether the burden of proving risk rests upon the employee or the employer. A number of courts have ruled that when there is a direct threat to the health or safety of others, a person is not "otherwise qualified" for employment. [14]

It appears that this "direct threat" provision is based on the Supreme Court's decision in  <u>School Board of Nassau County v.</u>

---

[14] In Borgialli's case, the district court referred to the issue of "direct threat" as a "defense" to plaintiff's claim.

<u>Arline</u>, 480 U.S. 273, 287–88, 94 L.Ed. 2d 307, 320–321 (1987) which held that a teacher was not otherwise qualified for her job under the provisions of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 if her tuberculosis infection posed a significant threat to the health or safety of others.[15]

In <u>E.E.O.C. v. Amego, Inc.,</u> 110 F. 3d 135, 142–144, (1st Cir. 1997), the First Circuit recognized that provisions of the ADA regarding qualifications were based upon the <u>Arline</u> decision. In <u>Amego</u>, an employee who worked at a residence for severely disabled patients claimed that she was terminated in violation of the ADA because of her diagnosed depression.[16]  In affirming the entry of summary judgment in favor of the employer, the court held that the record supported the employer's determination that the employee's depression made her unqualified to perform essential job functions such as administering and monitoring residents' medication.  In so

---

[15]     See <u>also, Doe v. University of Maryland Medical System Corp.</u>, 50 F. 3d 1261 (4th Cir. 1995), where plaintiff, a medical resident, who tested positive for HIV infection, was barred from surgical practice.  In affirming the district court's award of summary judgment to the defendant in this ADA action, the Fourth Circuit ruled that the resident was "not an otherwise 'qualified individual' with a disability."

In <u>Estate of Mauro v. Borgess Medical Center</u>, 137 F. 3d 398 (6th Cir. 1998), <u>cert.</u> <u>den.</u>, 119 S. Ct. 51), an HIV infected surgical technician was found to be a direct threat to the safety of others, and thus was not an "otherwise qualified individual" for a position.  Both of these HIV cases stressed the seriousness of the risk of others.

[16]  This case was filed by the Equal Employment Opportunity Commission (EEOC), as plaintiff, on behalf of the terminated employee.

ruling, the court discussed plaintiff's burden of proof in this manner:

> We hold that, in a Title I ADA case, it is the plaintiff's burden to show that he or she can perform <u>the essential functions of the job</u>, and is therefore "qualified". Where those essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others. There may be other cases under Title I where the issue of direct threat is not tied to the issue of essential job functions but is purely a matter of defense, on which the defendant would bear the burden. . . . For the reasons which follow, we conclude plaintiff's burden was not met. (110 F. 3d at 144). [17] (Emphasis supplied)

In <u>Moses v. American Nonwovens, Inc.</u>, 97 F. 3d 446 (11th Circuit 1996), <u>cert. den.</u> 519 U.S. 1118 (1997), an employee who had epilepsy was terminated from a job in which he worked near dangerous machinery.[18] In sustaining summary judgment in favor of the employer, the court held that "[t]he employee retains at all times the burden of persuading the jury either that he was not a direct threat or that reasonable accommodations were available," and that plaintiff Moses "failed to produce probative evidence that he was not a direct threat." 97 F. 3d 446 at 447.

---

[17] Plaintiff contends that the <u>Amego</u> case is distinguishable because Borgialli was not responsible for the safety of others. This contention is contrary to the record because concern for the safety of others was included in plaintiff's job description.

[18] In his workplace, Moses sat on a platform above fast-moving press rollers, or underneath a conveyer belt with "in-running" pinch points. He also worked next to exposed machinery that reached temperatures of 350 degrees.

In <u>Robertson v. Neuromedical Center</u>, 983 F. Supp. 669, (M.D. La. 1997), <u>affirmed</u>, 161 F. 3d 292, (5th Cir. 1998), <u>cert. denied</u>, 119 S. Ct. 1575 (1999), the plaintiff was a neurologist with attention deficit hyperactivity disorder, which interfered with his ability to complete charts and interpret tests. In affirming the entry of summary judgment in favor of his former employer, the Fifth Circuit ruled that the neurologist was not a "qualified individual" under the ADA because he was unable to perform the essential functions of his job since his memory problems posed a "direct threat" to the medical safety of his patients. [19]

In <u>Pikora v. Blue Cross & Blue Shield of Michigan</u>, 970 F. Supp. 591, 595 (E.D. Mich. 1997), an ADA action, the court found that the employee, who suffered from depression and migraine headaches, failed to establish that she was qualified for a position as a customer service representative.

In <u>Newman v. Chevron U.S.A.</u>, 979 F. Supp. 1085 (S.D. Tex. 1997), the court found that an employee afflicted with post-traumatic stress disorder, which caused him to lose his concentration and memory, was not qualified for his "extremely dangerous" position of driving a truck filled with highly flammable gasoline, with or without accommodation by his employer. In granting summary judgment, the court noted the extreme risk to others which such occupation presented: (979 F. Supp. 1090)

---

[19] In this case, Dr. Robertson had "voiced his own concerns about his ability to take care of patients, stating that it was only a matter of time before he seriously hurt someone." 161 F. 3d at 296.

> Assuming that Plaintiff is suffering from a disablement as alleged in his Complaint, the Court finds that Plaintiff is not qualified for the position from which he was terminated because he cannot perform the essential function of driving a gasoline truck. . . . Plaintiff was hired as a gas delivery driver. By his own admission, Plaintiff's tasks included driving an eighteen-wheeled semi-tractor trailer from the terminal where his truck was loaded with highly flammable gasoline, to retail service stations, where this highly flammable fluid was put into underground storage tanks. Regardless of one's mental state, hauling flammable gasoline over the open road is extremely dangerous. Undertaken with a condition that causes loss of concentration and memory, such activity approaches utter recklessness and blatant disregard for the safety of others. . . .

In contrast to the above cases, some courts have suggested that the burden of proof be imposed upon the employer when the position in question does not obviously or necessarily include a risk to others. The various rulings in Rizzo v. Children's World Learning Centers, illustrate the importance of a careful evaluation of the degree of risk which a disabled person presents in his or her work situation. Rizzo involved a hearing-impaired employee of a child care center who sued her former employer under the ADA. It appears that she was demoted because the child care center believed that plaintiff could not safely drive the school van. The district court granted summary judgment for the employer. The Fifth Circuit reversed and remanded the case upon a finding that there was an issue of material fact as to whether the van driver was a direct threat to the safety of others. Rizzo v. Children's World Learning Centers, Inc., 84 F. 3d 758 (5th Cir. 1996).

Following this remand, and after trial, the district court entered judgment on a jury verdict for the employee, the employer appealed, and that judgment was affirmed. Rizzo v. Children's World Learning Centers, Inc., 173 F. 3d 254 (5th Cir. 1999).[20] Thereafter, the Fifth Circuit entered an order for rehearing en banc, 187 F. 3d 680, and, again affirmed the judgment. Rizzo v. Children's World Learning Centers, Inc., 213 F. 3d 209 (5th Cir. 2000), cert. denied, Child. World Learning Cen. Inc., v. Rizzo, _____Sup. Ct. _____, 2000 WL 1279326, 69 USLW 3166 (U.S. Oct. 30, 2000). In this last decision, the Fifth Circuit ruled that since the employer had failed to object to the burden of proof instruction, the trial court had not committed "plain error" in instructing that the burden rested upon the employer and that, in any case, the court would not resolve the burden of proof issue which was raised for the first time on appeal. In addition, the court ruled that the evidence supported the jury's finding that plaintiff was able to drive the van safely and did not pose a

---

[20] In instructing the jury, the trial court gave conflicting instructions on which party had the burden of proving that plaintiff was a "direct threat". The 5th Circuit agreed with the Moses opinion in the 11th Circuit that the burden of proof is on the plaintiff to prove that, as a qualified individual, she is not a direct threat to herself or others, but disagreed with Moses "only insofar as that opinion allows for no exceptions to this rule." In explaining this ruling the Fifth Circuit noted that ... when a court finds that the safety requirements imposed tend to screen out the disabled, then the burden of proof shifts to the employer, to prove that the employee is, in fact, a direct threat." 173 F. 3d at pp. 259-260.

threat to her passengers.[21]  In arriving at this decision, the court cited the opinions in Moses v. American Nonwovens, Inc., and EEOC v. Amego, Inc., supra, stating:

> It is unclear from the statutory scheme who has the burden on this issue.  It may depend on the facts of the particular case.  The EEOC suggested at argument that where the essential job duties necessarily implicate the safety of others, the burden may be on the plaintiff to show that she can perform those functions without endangering others; but, where the alleged threat is not so closely tied to the employee's core job duties, the employer may bear the burden. . . . None of these issues were raised in the district court and all we decide today is that the district court did not commit plain error in its charge. (213 F. 3d, note 4, at p. 213). (Citation omitted)

See also, Nunes v. Wal-Mart Stores, Inc., 164 F. 3d 1243 (9th Cir. 1999), where the terminated employee, who suffered from fainting episodes, sought damages under the ADA.  The district court entered summary judgment for the employer, finding that plaintiff "posed a direct threat to customers of Wal-Mart."  In reversing and remanding the case, the circuit court found that plaintiff had raised an issue of material fact as to the question of "direct threat."  In this case, it appears that in her capacity as a cashier, plaintiff would not ordinarily be considered as a "risk" to Wal-Mart customers.[22]

---

[21]  At trial, plaintiff presented evidence of her driving skills and an audiologist's report addressing safety concerns.

[22] In Nunes, the employer had no medical evidence concerning plaintiff's disability at the time she was terminated, and no inquiry was made as to what accommodations might be made to continue her employment.

In Borgialli's appeal, he contends that regardless of the potential harm involved, there must be additional findings regarding other issues mentioned in the federal regulations concerning the "likelihood that potential harm will occur," the duration of the risk, and the "imminence" of potential harm. The district court in this case did weigh all factors to be considered in determining "risk," and correctly concluded that plaintiff's dangerous occupation was of determining weight in this case:

> In analyzing the Mine's assessment, the Court must evaluate the impact of Mr. Borgialli's inherently dangerous occupation . . . . A lapse in safety by a blaster could easily result in serious bodily injury or death for multiple individuals. The nature and severity of the potential harm, therefore, weighs heavily in a finding that Mr. Borgialli posed a "direct threat."
>                    * * * *
> The Court finds that no reasonable jury could fault the Mine for its decision to preclude Plaintiff's return to work until it received assurance from a doctor that Mr. Borgialli no longer posed a safety risk. (Slip opinion at p. 13).[23]

In the case before us, the defendants were confronted with a situation in which its employee, who worked with explosives and who

---

[23] With regard to any question of "accommodation," the court found that this was not an issue in the case:

> In this case, because safety is vitally important, it follows that an "unsafe" employee could not be accommodated in the blaster position. Plaintiff has consistently maintained that he could have returned without accommodation, because he was never disabled or a threat. . . This case clearly revolves around whether Plaintiff actually posed a safety risk, not whether such a risk could be accommodated. (Fn. 7, slip opinion at p. 13)

22

harbored a grudge against his supervisor, threatened suicide and perhaps injury to others. The company obtained an independent medical opinion from Dr. Silvestri who found that plaintiff could not safely return to his work as a blaster. Defendants then considered the report of Dr. Vuolo who believed that plaintiff could perform the "cognitive and physical aspects of the job," but with the proviso that he was not able at that time "to successfully manage a relationship with Mr. Ospeth as his supervisor." Defendants then requested that a third medical opinion be obtained, but plaintiff refused to assent to this and demanded an immediate return to work. Under all of these circumstances, we find that the district court correctly found that defendants' motion for summary judgment should be sustained:

The ADA does not require employers to take unnecessary risks when dealing with a mentally or physically impaired employee in an inherently dangerous job. Plaintiff was not a "qualified person" to work in a position as a blaster because the defendants rightly considered that he was a direct threat to others in the workplace. It must also follow that the district court correctly found that plaintiff was not a "qualified person" under the Wyoming Fair Employment Practices Act, and that his state claim for breach of contract must fail because he was, in fact, terminated for "cause" as a safety risk.

Accordingly, the district court's grant of summary judgment in favor of defendants is AFFIRMED.

23