In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3746

Loretta M. Emerson, formerly known
as Loretta M. Rubenzer,

Plaintiff-Appellant,

v.

Northern States Power Company,

Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99 C 809--Barbara B. Crabb, Judge.

Argued March 26, 2001--Decided June 26, 2001

   Before Flaum, Chief Judge, and Bauer and
Rovner, Circuit Judges.

   Bauer, Circuit Judge.  Loretta
Emerson/1 sued her former employer,
Northern States Power Company ("NSP") for
firing her in violation of the Americans
with Disabilities Act ("ADA") 42 U.S.C.
sec. 12101 et seq. The district court
granted summary judgment in favor of NSP
on the ground that Emerson was not a
qualified individual. We affirm.

I.  Background

   Emerson began working in NSP's Eau
Claire Customer Information Center in
1994. She began as a part-time "student
operator," but was promoted to a part-
time "associate consultant" position
within six months. Despite the part-time
classification, Emerson generally worked
40 hours per week. As an associate
consultant, Emerson mainly handled
routine customer calls, but by her
estimate roughly 5% to 10% of her job
entailed processing customer calls about
gas and electrical emergencies, such as
gas leaks and downed power lines. The job
description designated handling such
calls as an "essential job function," and
estimated the volume of calls to comprise
20% of an associate consultant's work. On

average, Emerson handled 2 to 5 gas emergencies per week and 2 to 5 electrical emergencies per week. This number generally increased when thunderstorms occurred. In 1994 and most of 1995, Emerson performed her job at or above the satisfactory level. However, for reasons the record does not elucidate, Emerson had strained relations with one of her supervisors, Lori Krigs.

Then, on October 1, 1995, Emerson fell and hit her head while rollerblading. The fall caused head trauma, including two skull fractures and a hematoma. Dr. Michael Murphy treated Emerson, hospitalizing her twice. He referred her to a speech/language therapist who conducted two therapy sessions with Emerson and evaluated her condition using cognitive tests. The therapist concluded in part that Emerson experienced difficulty learning new information and had moderate memory impairments. At the end of October, relying on the tests the therapist administered, Dr. Murphy released Emerson to return to her associate consultant position with no medical restrictions.

Upon her return, Emerson had difficulty learning NSP's new telephone and computer systems. Her supervisors complained that she asked many questions more than once and seemed unable to retain information. Her supervisors also noted that she made mistakes when working on complex, yet routine tasks and was much more emotional than she had been before the accident. Emerson's supervisors evaluated her job performance in 1996 as needing improvement in the areas of problem-solving, information retention, and communication. Emerson continued to have difficulties with Krigs, a situation which caused her stress.

On Saturday, April 27th, Emerson experienced an anxiety attack at work. The attack, Emerson's first, included symptoms characteristic of a heart attack. Emerson spent the rest of her shift at the emergency room, but was able to return to work on Monday. Dr. Murphy prescribed anti-anxiety medication for Emerson to take when she felt the onset of an attack, but she took it infrequently. Rather, she tried to reduce stress at work by avoiding contact with Krigs. Emerson suffered another panic

attack at work on June 6th. She took her medication and, with permission from NSP, went home for the day. Emerson was not handling calls when she experienced either of the attacks.

NSP was concerned that Emerson's panic attacks might prevent her from adequately handling safety-sensitive calls. It required her to be evaluated by the company's occupational medicine physician, Dr. Donald Bodeau, regarding her ability to safely perform her job, and she saw him several times during the summer of 1996. Dr. Bodeau believed that the panic attacks were related to Emerson's head trauma. After Emerson's first evaluation, Dr. Bodeau recommended placing Emerson on a paid leave of absence, which NSP did. After a follow-up exam on June 19th, Dr. Bodeau cleared Emerson to return to work in a non-safety-sensitive position. NSP placed her in a billing position for two months to fill in for an employee on maternity leave. Emerson worked the same number of hours and received the same pay as she did in her associate consultant position. She performed well in the billing department.

NSP asked Emerson to be re-evaluated by Dr. Bodeau on July 17th. Dr. Bodeau noted that Emerson felt relaxed in the billing position, but when she spoke of returning to her position as an associate consultant, she became agitated and believed that Krigs was conspiring against her. Emerson continued to show signs of memory loss and difficulty communicating. Dr. Bodeau sent Emerson to Dr. Thomas, a psychologist, for further neurological testing. Dr. Thomas concluded that while her test results were within normal limits, she suffered from acute anxiety disorder and probable panic attacks. He noted that Emerson's condition would likely improve over the next one to two years, although he could not offer assurances that she would recover fully, and recommended that NSP reinstate her to the associate consultant position. Dr. Murphy and Dr. Bodeau agreed that Emerson suffered from an anxiety disorder, although Dr. Bodeau thought it was fairly mild.

On August 16th, Emerson met with her supervisors from NSP to discuss returning to work as an associate consultant. At

that meeting, NSP gave Emerson a written warning, the second step in the disciplinary process, memorializing its concern about her performance. NSP had not given Emerson a level one warning, but had the discretion to skip disciplinary steps. Emerson indicated that in case of a panic attack, she would need to talk to her supervisor and take a break. At Dr. Bodeau's recommendation, NSP allowed Emerson five minutes to collect herself in case of a panic attack. Emerson consulted Dr. Murphy who informed NSP that a five minute break might be insufficient time for Emerson to regain her composure. He could not, however, specify how much time she would need. Because of NSP's concern, Emerson suggested that safety-sensitive calls could be routed away from her, or that a co-worker could take over for her in case she had a panic attack while dealing with a safety-sensitive call. NSP rejected these options because of the uncertainty that another consultant or supervisor would be available to take the call. Further, Emerson suggested that her stress level would be reduced if Krigs stopped supervising her. NSP declined to make this arrangement.

Dr. Bodeau unsuccessfully attempted to reach Dr. Murphy to discuss his recommendation that five minutes was not enough time for Emerson to recover from a panic attack. Dr. Bodeau then recommended that Emerson be transferred out of her safety-sensitive position. Further, based on his prediction that it would take Emerson up to two years to fully recover, NSP concluded Emerson would have to leave her consultant position. NSP identified an available full-time administrative assistant job, but required Emerson to apply for it because Emerson's associate consultant position was classified as part-time despite its usual full-time hours. Emerson was not interviewed or hired for this position. NSP offered Emerson a temporary, part-time cash processor position, which she turned down. Toward the end of October, a supervisor notified Emerson that an associate consultant position with no safety-sensitive calls was available in Minnesota. Emerson did not apply. Emerson's employment was terminated effective October 31, 1996. NSP did not notify Emerson about any other available positions for which she qualified,

although some existed. A vocational rehabilitation expert who later evaluated Emerson concluded that her head injury, which sensitized her to stress and increased her need for routine, precluded her from 47% of all occupations and rendered her disabled.

After Emerson's termination, she worked briefly scheduling factory workers, but left because scrambling every morning to find substitute workers for absent employees was too stressful. Emerson subsequently performed office work and maintenance for a housing management com pany for three years, and supplemented her income by working temporary jobs as a booking agent and order processor. Emerson left these jobs to become a property manager. She has had difficulty finding a job that pays as much as NSP paid her.

Emerson sued NSP for monetary and injunctive relief under the ADA, arguing that NSP failed to offer her a reasonable accommodation and fired her because she was disabled. The district court found that an issue existed as to Emerson's disability in the major life activities of learning and working. However, the court granted summary judgment in favor of NSP finding that Emerson was not a qualified individual under the ADA because she was unable to handle safety-sensitive calls with or without reasonable accommodation.

II.  Discussion

We review the district court's grant of summary judgment de novo. See Sinkler v. Midwest Property Mgmt., Ltd. P'ship., 209 F.3d 678, 682 (7th Cir. 2000). To persuade us to reverse the district court, Emerson must marshal the pleadings, depositions, answers to interrogatories, and affidavits to create an issue of material fact regarding the challenged factors, or she must show that NSP is not entitled to judgment as a matter of law. See id. at 683. The ADA prohibits covered entities such as NSP from discriminating against a qualified individual with a disability on the basis of the disability. See 42 U.S.C. sec. 12112(a). In this case, Emerson defends the district court's holding that she has created a material issue of fact regarding whether she was disabled at the

time she was terminated, but she attacks the district court's determination that she was not a qualified individual as defined by the ADA.

## A.  Was Emerson Disabled?

The ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. sec. 12102(2). Emerson endeavors to show that she meets all three definitions. We initially tackle the first definition by following the procedure in Bragdon v. Abbott, 524 U.S. 624, 632-42 (1998). We determine whether (1) Emerson has a physical or mental disability (2) that impacts a major life activity and (3) whether the impairment substantially limits those activities. See id.

Emerson argues that her head injury resulted in mental impairments including anxiety, panic attacks, learning difficulties, and increased emotionality. She garners proof of these effects from the reports of Drs. Murphy, Bodeau, and Thomas. The Department of Health and Human Services defines a "mental impairment" as "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. sec. 1630.2(h)(2). "[M]edically diagnosed mental conditions are impairments under the ADA." Krocka v. City of Chicago, 203 F.3d 507, 512 (7th Cir. 2000) (internal quotation omitted). Emerson's diagnoses provide evidence that precludes summary judgment on the disability issue for NSP. At the time of her injury, the speech therapist found that Emerson suffered from a moderate impairment in her ability to learn, to retain new information, and to concentrate. During the summer of 1996, three separate doctors diagnosed Emerson with anxiety disorders of varying seriousness. Further, in June of 1996, Dr. Bodeau noted that he found evidence

of "mood alteration, sudden personality change, learning ability and panic attacks." NSP counters with Dr. Bodeau's ultimate conclusion that of Emerson's test results were in the normal range. While this evidence could persuade a jury to find that Emerson suffers from no impairment, it does not remove the issue of fact.

Emerson contends that her impairment effects the established major life activities of learning and working. See 29 C.F.R. sec. 1630.2(i). She further argues that memory, concentration, and interacting with others are major lifeactivities that her brain injury impairs, but offers no legal precedent to support her assertion. Emerson has not sufficiently developed her contentions on appeal, and we will not decide the issue. Rather, we will adopt the district court's approach and treat memory, concentration, and interacting with others as activities that feed into the major life activities of learning and working.

The parties hotly dispute whether Emerson's impairments substantially limited her major life activities. According to the Code of Federal Regulations, a person is "substantially limited" if compared to the average person in the general population she cannot perform or is limited in the manner, duration, or condition in which she can perform a major life activity. See 29 C.F.R. sec. 1630.2(j)(ii). Emerson points to several pieces of evidence to show her substantial limitation in the area of learning. She had excessive difficulty learning NSP's new telephone and computer systems, and frustrated her supervisors with repetitive questions and her inability to remember the answers. One supervisor noted that Emerson made mistakes when she attempted to complete routine, yet complex aspects of her job that she performed competently before the accident. To establish the severity of her impairments, Emerson relies on Dr. Bodeau's June 7th conclusion that Emerson had difficulty learning and his June 19th report finding cognitive difficulties. Further, on July 19th, Emerson failed a test that required her to count by threes and sevens. This evidence, compiled from both her employer and doctor's reports is more than sufficient to create an issue

of material fact.

NSP counters that cognitive tests administered by Dr. Thomas showed that Emerson's cognitive function fell in the normal range, prompting Dr. Bodeau to recommended returning Emerson to her consultant position. Further, NSP argues that Emerson's work performance problems revolved primarily around her panic attacks and her bad relationship with Krigs, not her ability to learn. Emerson's evidence clearly disputes NSP's assertions. Such an issue of material fact cannot be resolved at the summary judgment stage.

Emerson also argues that she is substantially impaired in the major life activity of working. To show a substantial limitation in this activity, Emerson must offer proof that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. 1630.2(j)(3)(i); Webb v. Choate Mental Health & Dev. Ctr., 230 F.3d 991, 998 (7th Cir. 2000) (quoting Weiler v. Household Fin. Corp., 101 F.3d 519, 525 (7th Cir. 1996)). We evaluate impairments on an individual basis to determine if they substantially limit a person's ability to work. See Moore v. J.B. Hunt Transp., Inc., 221 F.3d 944, 952 (7th Cir. 2000) (citation omitted). In support on her argument, Emerson presents her vocational rehabilitation specialist's conclusion that Emerson is foreclosed from a broad range of jobs--47% of all occupations. NSP challenges the report, arguing that it does not describe how Emerson's anxiety and need for routine foreclose her from this range of jobs, that the vocational rehabilitation specialist called her impairment "minor," and that he failed to consider the potential effect of Emerson's medication when determining the effect of her impairment on her ability to work. NSP's arguments call the report into question, but do not discredit it to the extent that we can disregard its conclusions. Emerson has created a question regarding whether she is disabled that precludes summary judgment on this issue. Given our holding, we decline to address the remaining definitions of "disabled."

B.  Was Emerson a qualified individual?

To be a "qualified individual," a plaintiff must be "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Weiler, 101 F.3d at 525 (quoting 42 U.S.C. sec.12111(8). Emerson disputes the district court's conclusion that she was not a qualified individual in four ways.

First, she argues that handling safety-sensitive calls was not an essential function for an associate consultant. An essential function is a fundamental job duty required of a person in the job the plaintiff holds or desires; a marginal duty is not an essential function. See 29 C.F.R. sec. 1630.2(n)(1). Factors that may be taken into account when determining whether a job duty constitutes as essential function include job description, employer's opinion, amount of time spent performing the function, consequences for not requiring the individual to perform the duty, and past and current work experiences. See Basith v. Cook County, 241 F.3d 919, 927 (7th Cir. 2001); 29 C.F.R. sec. 1630.2(n)(3).

NSP considers, and its associate consultant job description designates, handling safety-sensitive calls as an es sential job function. Emerson argues that the relative rarity of such calls (5% of the job, by her estimate) shows that they are only a marginal duty. Although we accept Emerson's estimate of the safety-sensitive call volume, it fails to rebut the essential function status. Consultants clearly receive safety-sensitive calls which are crucial as they have potentially dangerous consequences if handled poorly. Emerson suggests that the calls could have been routed to another consultant, but this does not change their essential function status. See Basith, 241 F.3d at 929 (holding that employer's ability to assign delivery duties to another employee does not make them nonessential).

Second, Emerson contends that she could handle the calls without reasonable accommodation. To be a "qualified

individual," the plaintiff must prove (1) that she possesses the prerequisites for the job, such as educational background, skills, and experience, and (2) that she can perform the job with or without reasonable accommodation. See Bay v. Cassens Transp. Co., 212 F.3d 969, 974 (7th Cir. 2000) (citations omitted). NSP contests only whether Emerson can handle safety-sensitive calls. Emerson notes that after her accident, she never had trouble dealing with a safety-sensitive call and that she never had an anxiety attack while on any call. She believes this demonstrates that there is no evidence to establish that she cannot handle safety-sensitive calls. We disagree. NSP is concerned about the potentially disabling effect a panic attack, such as the two Emerson has experienced at work, and her need for an indeterminate recovery time could have on her ability to handle emergency calls. Indeed, it emphasizes Dr. Bodeau's recommendation that Emerson be removed from her position:

[g]iven these considerations as well as the job description provided for a consultant in the customer information center, it is my opinion that [Emerson] should be reassigned out of the gas-sensitive activities that she found so stressful.

Given Emerson's need for an indeterminate recovery time and the potentially dangerous effects of a mishandled or tardily handled safety-sensitive call, Emerson's evidence fails to create an issue of fact regarding whether she can adequately perform her job.

Emerson contends, however, that the district court improperly analyzed NSP's argument under the routine "qualified individual" framework. Rather, Emerson asserts that the "direct threat" rubric is more appropriate because NSP's arguments are better characterized as concern that Emerson posed a direct threat to the safety of its customers. Emerson and NSP disagree about the role this test should play, and unfortunately, this leads their appellate briefs to be underdeveloped. Emerson believes it was NSP's burden to present it as an affirmative defense; NSP believes it was Emerson's duty to advance it as a theory of the case. We agree that the direct

threat test can be applied appropriately here, but the results are no different than under "qualified individual" analysis.

An employee is not a qualified individual if she poses "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. sec. 12111(3). Under the direct threat framework, the employee shoulders the initial burden of proof and may proceed in one of two ways. First, she may present direct or circumstantial evidence that the employer discriminated on the basis of her disability. See Bekker v. Humana Health Plan Inc., 229 F.3d 662, 670 (7th Cir. 2000) (citation omitted). The employer must then prove, with medical or objective evidence, see Bragdon, 524 U.S. at 649 (citation omitted); 29 C.F.R. sec. 1630.2(r), that it would have made the same decision absent the discrimination. See Bekker, 229 F.3d at 670 (citation omitted). Alternatively, the employee could opt for the McDonnell-Douglas burden-shifting test. It requires the employee to create an inference of discrimination by bringing a prima facie case. See id. at 672. The employer then must provide a legitimate business reason for its action, whereupon the burden shifts back to the employee to show by a preponderance of the evidence that the proffered reason is pretextual. See id.

Emerson focuses her efforts on contending that NSP has failed to shoulder its burden of proof. Consequently, we are unsure under which option she proceeds. It is unnecessary for us to guess at Emerson's choice, however, because NSP meets its burden under either framework. NSP's decision would have been the same absent discrimination and was a legitimate business decision.

To determine whether an individual poses a direct threat, we must consider factors including: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and (4) the imminence of potential harm. See Borgialli v. Thunder Basin Coal Co., 235 F.3d 1284, 1291 (10th Cir. 2000). NSP presented unchallenged doctors' opinions that Emerson suffered from an anxiety disorder that might disappear in one to

two years, but might never improve. Consequently, she required unpredictable breaks of indeterminate time to recover from a condition she exhibited at work previously. Emerson worked at a job which required prompt, accurate handling of emergencies such as gas leaks and downed power lines that could pose significant danger to the public. Although Emerson argues that she is unlikely to suffer a panic attack at work, she has already suffered two. By its very nature, the consultant job could be stressful, and Emerson would be in contact with a supervisor who caused her further stress. This evidence is enough for us to find that Emerson posed a direct threat in the consultant position. See, e.g., Bekker, 229 F.3d at 671-72 (holding that doctor who was suspected of drinking on the job posed a direct threat although she had not injured any patients); Borgialli, 235 F.3d at 1294 (determining that an employee who had a good record in his job as a blaster, but who suffered from dizziness, held a grudge against his supervisor, and threatened harm to himself and others was a direct threat).

NSP could not reduce its risk by reasonably accommodating Emerson. NSP considered allowing Emerson breaks to recover from her panic attacks. It found five minute breaks to be acceptable, but the indeterminate time Emerson requested simply introduced too much uncertainty into NSP's handling of emergency calls. NSP appropriately declined Emerson's suggestion to route safety-sensitive calls away from her. An employer is not obligated to change the essential functions of a job to accommodate an employee. See Cochrum v. Old Ben Coal Co., 102 F.3d 908, 913 (7th Cir. 1996) ("In short, reasonable accommodation does not encompass reallocation of essential job functions."). Emerson further suggested that in case of a panic attack, a supervisor could handle her safety-sensitive calls. NSP rejected this option because it did not always staff a supervisor and would have had to create new supervisor shifts to accommodate Emerson, which the ADA does not require. See id. at 912 (holding it is not reasonable to require an employer to hire a helper to do overhead work for a miner who cannot perform this essential job function alone). Emerson does not bring any evidence tending to show that NSP's

business reason for terminating her was pretextual. Therefore, Emerson is not a qualified individual, and NSP is entitled to summary judgment on this ground.

Third, Emerson contends that NSP failed to offer her reasonable accommodations because it failed to participate in the interactive process the ADA requires. As part of the reasonable accommodation duty, the ADA requires employers to engage in an interactive process with disabled employees needing accommodation so that together they can identify the employee's needs and discuss accommodation options. See Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 693 (7th Cir. 1998). However, an employer's failure to engage in the interactive process or causing the process to breakdown by itself is insufficient to support employer liability. See Rehling v. City of Chicago, 207 F.3d 1009, 1015-16 (7th Cir. 2000). Rather, the employee must further show that the breakdown of the interactive process led to the employer's failure to provide a reasonable accommodation. See id. at 1016.

Emerson criticizes Dr. Bodeau for failing to discuss Dr. Murphy's break recommendation with him before recommending that NSP remove Emerson from her consultant position, and NSP for following this recommendation. However, the evidence shows that NSP engaged in the interactive process in good faith. It considered numerous medical diagnoses and recommendations to determine the effect of Emerson's disability. It offered to retain her as a consultant with the understanding that she could take a five minute break in the event of a panic attack. However, NSP felt that it could not offer Emerson breaks of indeterminate time that Dr. Murphy opined she needed. After an unsuccessful attempt to communicate with Dr. Murphy, NSP offered to accommodate Emerson by transferring her to a temporary position. Further, NSP allowed Emerson to submit a late application for a full-time job. Emerson was not selected for the full-time job and she rejected the part-time job offer. NSP offered Emerson a reasonable accommodation.

Finally, Emerson argues that NSP should have relocated her within the company

rather than fire her because she expressed interest in remaining at NSP. Reassigning disabled employees to vacant positions that they can perform is a reasonable accommodation. See Hendricks-Robinson, 154 F.3d at 693. However, the employee is not entitled to her preferred accommodation. See Gile v. United Airlines, Inc., 95 F.3d 492, 499 (7th Cir. 1996). NSP offered to reassign Emerson to an available position as a temporary cash processor, which she refused. NSP did not simply transfer Emerson into the available full-time position because it would have been a promotion from part-time status to full-time status. After evaluating the job applications, NSP opted not to hire Emerson for the job. Before Emerson was terminated, NSP also alerted her to an associate consultant position that was available in Minnesota, which would not have required her to field safety-sensitive calls. Emerson opted not to apply. NSP satisfied its duty. Emerson contends that NSP had a continuing duty to notify her of available positions even after she was terminated, but did not do so. She cites no legal support for this position.

III. Conclusion

Because we hold as a matter of law that Emerson is not a qualified individual, we AFFIRM the grant of summary judgment in favor of NSP.

FOOTNOTES

/1 Between the time of the events and the time the case went to trial, plaintiff changed her last name from "Rubenzer" to "Emerson." For the sake of consistency, we refer to plaintiff as "Emerson."