**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 24, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KELLY OSBORNE,

      Plaintiff - Appellant/Cross-
Appellee,

v.

BAXTER HEALTHCARE
CORPORATION, d/b/a BioLife Plasma
Services, L.P.,

      Defendant - Appellee/Cross-
Appellant.

Nos. 14-8047, 14-8052

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 2:13-CV-00139-SWS)**

---

Dale A. Gaar, Denver, Colorado (Stephen H. Kline and Melinda S. McCorkle, Kline Law Office, PC, Cheyenne, Wyoming, with him on the briefs), appearing for Plaintiff-Appellant/Cross-Appellee.

Bradley T. Cave, P.C., Holland & Hart LLP, Cheyenne, Wyoming, appearing for Defendant-Appellee/Cross-Appellant.

---

Before **HARTZ, HOLMES,** and **MATHESON,** Circuit Judges.

---

**MATHESON**, Circuit Judge.

---

Kelly Osborne, who is deaf, applied to work as a plasma center technician ("PCT") at BioLife Plasma Services.[1] After two interviews, Ms. Osborne was conditionally offered the PCT position pending final tests and paperwork. When BioLife's human resources department received Ms. Osborne's medical information, it determined Ms. Osborne could not safely monitor the donor area of the facility because she could not hear the alarms on the plasmapheresis machines,[2] which audibly sound when something goes wrong or requires attention. When Ms. Osborne reported to the facility for her first day of work, Joe Elder, the manager, informed her BioLife had rescinded her offer of employment.

Ms. Osborne filed a lawsuit alleging that BioLife's revocation of her job offer violated the Americans with Disabilities Act ("ADA"). The district court determined Ms. Osborne failed to identify accommodations that would allow her to perform essential functions of the PCT position. The court granted summary judgment to BioLife and instructed each party to bear its own costs.

---

[1] Baxter Healthcare Corporation does business in Wyoming as BioLife Plasma Services, L.P. Like the parties, we refer to the appellee as "BioLife."

[2] The plasmapheresis machines, or "Auto C" machines, remove blood from a donor, separate the plasma, and return the red blood cells to the donor. *See* Aplt. App. at 28-29.

Both parties appeal. Ms. Osborne appeals the district court's grant of summary judgment to BioLife. BioLife cross-appeals, seeking reversal of the district court's determination that each party should bear its own costs.

We conclude Ms. Osborne has identified a genuine dispute of material fact regarding her ability to perform essential functions of the PCT position with reasonable accommodation, making summary judgment premature. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the district court's grant of summary judgment for BioLife and deem BioLife's cross-appeal for costs moot.

## I. **BACKGROUND**

### A. *Factual History*

In 2007, BioLife replaced three positions—medical historian, phlebotomist, and sample prep technician—in its workforce with a single PCT position, which performed three primary functions: (1) taking donors' medical history, (2) monitoring the area where donors give plasma to watch for adverse reactions, and (3) working in the sample preparation area where donated plasma is processed and stored. In late 2007, BioLife formalized a position description for the PCT position. Employees in one of the prior positions were given one year to train into the PCT position, and all entry-level employees hired by BioLife after January 2008 were hired as PCTs.

In August 2008, Ms. Osborne applied to work as a PCT at BioLife's facility in Cheyenne, Wyoming. Mr. Elder initially interviewed Ms. Osborne. She subsequently met with BioLife's supervisory staff. In both instances, Ms. Osborne made clear she is

deaf and communicates primarily through lip reading. Mr. Elder made Ms. Osborne a conditional offer of employment contingent upon a background check, a drug test, and a medical screening.

After receiving Ms. Osborne's medical paperwork, BioLife's human resources department—which is based in Illinois—determined she could not safely monitor the donor area of the facility because she could not hear the audible alarms on the plasmapheresis machines, which sound when something goes wrong or needs attention. When Ms. Osborne reported to work in September 2008, Mr. Elder informed her that, because of safety issues, BioLife had rescinded her offer of employment.[3] Ms. Osborne contacted BioLife, and Melissa Grabiner, a Staffing Manager, explained in an email that BioLife could not hire her as a PCT because she would be unable to hear audible alarms on the plasmapheresis machines and could not safely monitor donors.[4]

---

[3] In her deposition, Ms. Osborne stated Mr. Elder identified safety concerns related to the plasmapheresis machine as the reason for rescinding the offer of employment: "Q: Did he discuss with you why he did not think you could do the phlebotomist job? A: He was—I think it was a safety reason because I couldn't hear the monitors." Aplt. App. at 151.

[4] BioLife initially justified withdrawing Ms. Osborne's job offer by noting she could not perform two essential functions: (1) hearing the audible alert or alarm from the plasmapheresis machine, and (2) perceiving a donor's need for attention when her back was to the donor. *See* Aplt. App. at 328-30, 421. After litigation began, BioLife identified two additional essential functions: (3) verbally communicating with donors, and (4) responding to donor reactions. In their briefs, the parties refer to "donor monitoring" as an essential function of the PCT position, which we understand to include both perceiving and responding to adverse reactions.

## B. *Procedural History*

Ms. Osborne filed a lawsuit alleging that BioLife's revocation of her job offer violated the ADA. She proposed four accommodations to allow her to perform the essential functions of a PCT: (1) job restructuring, (2) enhanced alerts on the plasmapheresis machines, (3) paging or call button systems for donors, and (4) a hearing oral interpreter.[5] BioLife moved for summary judgment, arguing Ms. Osborne could not perform the essential functions of a PCT with or without reasonable accommodation and was not entitled to relief under the ADA.

On May 30, 2014, the district court issued an oral ruling granting BioLife's motion for summary judgment. The court concluded Ms. Osborne had not carried her burden of showing she could perform the essential functions of the PCT job with or without reasonable accommodation. The court granted summary judgment to BioLife and instructed each party to bear their own costs.

## II. **DISCUSSION**

Ms. Osborne appeals the district court's summary judgment order, and BioLife cross-appeals the district court's decision on costs. As we detail below, we believe there are material disputes of fact as to whether Ms. Osborne's proposed accommodations are

---

[5] On appeal, Ms. Osborne argues (1) job restructuring, (2) visual or vibrating alerts on the plasmapheresis machines, and (3) call buttons for donors are reasonable accommodations. She does not challenge the district court's determination that providing a hearing oral interpreter is not a reasonable accommodation because employers are not required to reassign or hire employees to perform functions of a disabled employee's job.

reasonable, and conclude that summary judgment is therefore inappropriate at this stage in the litigation. We reverse the district court's summary judgment order and remand for further proceedings. On the basis of this determination, we deem BioLife's cross-appeal for costs moot.

## A. *Summary Judgment*

Ms. Osborne argues reasonable accommodations would allow her to perform the essential functions of perceiving the alarms on the plasmapheresis machines and engaging in donor monitoring. To determine whether summary judgment is appropriate, we (1) identify the applicable standard of review, (2) discuss relevant legal standards that narrow the issues before us on appeal, (3) review the district court's determinations, (4) consider each of Ms. Osborne's proposed accommodations in turn, and (5) address a remaining concern BioLife has raised regarding essential functions of the PCT position.

### 1. **Standard of Review**

On appeal, "[w]e review summary judgment determinations de novo, applying the same standard as the district court." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). We view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his or her favor. *Id.* Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this inquiry, "[t]he nonmovant is given wide berth to prove a factual controversy exists." *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1182 (10th Cir. 2003) (quotations omitted).

2. **Legal Background**

We evaluate BioLife's decision to rescind Ms. Osborne's job offer using ADA law. Our analysis is guided by: (1) the elements of a prima facie case of discrimination under the ADA, (2) the burden-shifting framework used to determine whether an accommodation is reasonable, and (3) the criteria used to determine whether health and safety concerns render an employee unqualified to perform the essential functions of a position. Before turning to the merits of Ms. Osborne's claims, we review these legal standards in turn.

a. *Prima facie case of discrimination under the ADA*

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).[6] "To establish a prima facie case of discrimination under the ADA, an employee must show: (1) she is disabled within the meaning of the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) she was discriminated against because of her disability." *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1118

---

[6] The burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), does not apply in this case. "If the employer admits that the disability played a prominent part in the decision, or the plaintiff has other direct evidence of discrimination based on disability, the burden-shifting framework may be unnecessary and inappropriate." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 n.3 (10th Cir. 1997). BioLife indisputably rescinded Ms. Osborne's job offer because of her disability. We therefore ask instead whether Ms. Osborne has established the three elements of a prima facie case of discrimination under the ADA. *Davidson*, 337 F.3d at 1189.

(10th Cir. 2004). Establishing a prima facie case is "not onerous," *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015) (quoting *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005)), and "summary adjudication may be improper when the employee has presented evidence she could perform the essential functions of her position" with the aid of an accommodation, *Mason*, 357 F.3d at 1124.

The parties agree Ms. Osborne's deafness constitutes a disability for purposes of the ADA, and agree that she satisfies the first element of the prima facie test insofar as she cannot hear the audible alert on the plasmapheresis machine or verbal requests from donors.[7] The parties also do not dispute that BioLife rescinded Ms. Osborne's job offer specifically because she is deaf, which constitutes discrimination on the basis of disability. *See* 42 U.S.C. § 12112(a) (prohibiting discrimination against qualified individuals in job application procedures and hiring).

But the parties disagree whether Ms. Osborne satisfied the second element of the prima facie test. For this element, courts use a two-step inquiry to determine whether a plaintiff is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired:

> First, the court determines whether the individual can perform the essential functions of the job. Second, if (but only if) the court concludes that the

---

[7] The district court based its ruling only on the essential functions of hearing the plasmapheresis machines and monitoring donors. It did not address the essential function of verbal communication. The parties do dispute whether Ms. Osborne satisfies the first element of the prima facie test with regard to the essential function of verbal communication, and we address this issue below. *See infra* Section II.A.5.

-8-

individual is unable to perform the essential functions of the job, the court determines whether any reasonable accommodation by the employer would enable [her] to perform those functions.

*Davidson*, 337 F.3d at 1190 (citation omitted); *see also* 42 U.S.C. § 12111(8) (defining the phrase "qualified individual"). Throughout this inquiry, "[t]he plaintiff bears the burden of showing she is able to perform the essential functions of her job." *Mason*, 357 F.3d at 1119; *see US Airways v. Barnett*, 535 U.S. 391, 400 (2002). Our analysis here is limited to the second step—whether reasonable accommodations would enable Ms. Osborne to perform the essential functions of the PCT position.

b. *Using burden shifting at summary judgment to determine whether the plaintiff is qualified with reasonable accommodations*

"Whether an accommodation is reasonable under the ADA is a mixed question of law and fact." *Mason*, 357 F.3d at 1122. When an employer moves for summary judgment in an ADA suit, courts use a burden-shifting framework to decide this issue. *White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995).

First, the employee "need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *Barnett*, 535 U.S. at 401. A proposed accommodation is not reasonable on its face if it would not enable the employee to perform the essential function at issue. *See* 29 C.F.R. § 1630.2(o)(1)(ii) (defining "reasonable accommodations" to include those "that enable an individual with a disability who is qualified to perform the essential functions of that position"); *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1264 (10th Cir. 2009) (deeming proposed

-9-

accommodations unreasonable because they would not enable the plaintiff to perform the essential functions of a position).[8]

Second, if the employee presents a facially reasonable accommodation, "[t]he burden of production then shifts to the employer to present evidence of its inability to accommodate." *Mason*, 357 F.3d at 1122; *White*, 45 F.3d at 361. The employer "must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Barnett*, 535 U.S. at 402.[9]

Third, "[i]f the employer presents such evidence, the employee has the burden of coming forward with evidence concerning her individual capabilities and suggestions for

---

[8] As we discuss below, where essential functions of a position implicate health and safety, an accommodation is also facially unreasonable when it is unable to eliminate a significant risk to health and safety. *See infra* Section II.A.2.iii.

[9] The ADA specifies considerations to guide the undue hardship inquiry:

> In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include—(i) the nature and cost of the accommodation needed under this chapter; (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility; (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12111(10)(B).

possible accommodations to rebut the employer's evidence." *Mason*, 357 F.3d at 1122.

"As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that he has been the victim of illegal discrimination based on his disability." *White*, 45 F.3d at 361; *see also Hawkins*, 778 F.3d at 894.

We discuss below whether the district court correctly allocated and considered these burdens when evaluating Ms. Osborne's proposed accommodations.

c. *Evaluating health and safety concerns with the direct threat criteria*

This case implicates an additional legal standard in the ADA known as "direct threat." In its motion for summary judgment, BioLife argued that if Ms. Osborne would pose any risk to health and safety—however small—she is unqualified to perform the essential functions of the PCT position. BioLife's argument misstates the law because we apply the "direct threat" standard to determine whether an employee, with or without accommodation, is a significant risk to health and safety and therefore unqualified for a position. Here we describe this standard and how courts have used it to assess the second element of a prima facie case under the ADA.

The ADA defines a "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3).[10]

---

[10] The assertion that an employee would pose a direct threat to the health and safety of others also can function as an affirmative defense under the ADA. *See* 42 U.S.C. § 12113(a)-(b); *Borgialli v. Thunder Basin Coal Co.*, 235 F.3d 1284, 1290 (10th Cir. 2000) ("Under the ADA it is a defense to a charge of discrimination if an employee poses a direct threat to the health or safety of himself or others."). As we discuss below,

Continued . . .

The EEOC's direct threat regulation identifies four criteria courts may consider when determining whether an individual would pose a direct threat: "(1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm." 29 C.F.R. § 1630.2(r).

When the "direct threat" standard is applied in the ADA's summary judgment burden-shifting framework described above, a plaintiff must initially demonstrate that her performing essential functions with a proposed accommodation would not significantly threaten the health and safety of others, *McKenzie v. Benton*, 388 F.3d 1342, 1354 (10th Cir. 2004); otherwise the accommodation would not be "reasonable on its face," *Barnett*, 535 U.S. at 402. Because the "direct threat" standard applies in this context, BioLife's argument—that any de minimis risk makes an accommodation unreasonable—fails.

In *School Board of Nassau County v. Arline*, 480 U.S. 273, 287-88 (1987), the Supreme Court determined whether an employee was "otherwise qualified" under the Rehabilitation Act by applying to health and safety concerns the same criteria the EEOC subsequently codified in its direct threat regulation. *See Bragdon v. Abbott*, 524 U.S. 624, 649 (1998) (observing that the ADA's direct threat provision codifies *Arline*);

---

Cont.

the same direct threat criteria used in the affirmative defense context are relevant when determining whether an employee is qualified to perform the essential functions of a position with reasonable accommodation—the second element of a prima facie case.

*EEOC v. Amego, Inc.*, 110 F.3d 135, 143 (1st Cir. 1997) (examining the relevant legislative history). When the essential functions of a position implicate health and safety, courts consider these criteria to determine whether an employee is qualified for purposes of the second element of the prima facie case. *See Arline*, 480 U.S. at 287-89; *Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007); *Branham v. Snow*, 392 F.3d 896, 905-07 (7th Cir. 2004); *McKenzie*, 388 F.3d at 1354-55; *Amego*, 110 F.3d at 145-46. Applying these criteria, we have said an employer's determination that an employee posed an impermissible threat to health and safety must be "objectively reasonable." *Jarvis*, 500 F.3d at 1122-23; *see also EEOC v. Beverage Distribs. Co., LLC*, 780 F.3d 1018, 1021-22 (10th Cir 2015).

As we explain in our analysis below, the "direct threat" criteria are relevant and helpful in assessing whether an employee is qualified to perform the essential functions of a position when an issue is whether a proposed accommodation satisfies health and safety concerns. We note "direct threat" analysis is useful only up to the point of determining whether an accommodation eliminates a significant risk to others. If it does not, the accommodation is unreasonable. If the accommodation does eliminate a significant risk, further analysis may be required to determine whether it enables a disabled individual to perform the essential functions of the position and is therefore reasonable on its face.

\* \* \*

The following summarizes our discussion of the legal landscape applicable to this case. To make out a prima facie case for discrimination under the ADA, Ms. Osborne must show (1) she is disabled; (2) she is qualified, with or without reasonable accommodations, to perform the essential functions of the job; and (3) she was discriminated against based on her disability. Because the parties agree elements (1) and (3) are met and Ms. Osborne is not qualified for the PCT position in the absence of reasonable accommodations, the issue is whether she is qualified with reasonable accommodations.

To determine this issue at summary judgment, courts employ a burden-shifting framework: (1) the plaintiff has the initial burden to show an accommodation is reasonable on its face, then (2) the defendant must show it cannot provide the accommodation without undue hardship, and finally (3) the plaintiff must rebut the employer's evidence based on her individual capabilities.

When the reasonableness of an accommodation turns on whether it alleviates health and safety concerns related to the essential functions of a position, the ADA's direct threat standard—whether a significant risk can be eliminated by reasonable accommodations—applies to whether the plaintiff has met her initial burden to show an accommodation is reasonable on its face. In other words, we ask whether the plaintiff has shown that her proposed reasonable accommodation would eliminate significant risk.

3. **District Court Order**

The district court based its order granting summary judgment to BioLife on the second element of a prima facie case of discrimination under the ADA, which asks whether Ms. Osborne "is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired." *Mason*, 357 F.3d at 1118. The court determined the first step of the qualification inquiry—whether Ms. Osborne is equipped to perform the essential functions of the job without reasonable accommodation—was not in dispute. It noted "the parties agree the essential functions of the PCT position include monitoring the donor area for any adverse reactions to the plasmapheresis process." Aplt. App. at 498. The plasmapheresis machines sound an alarm when something has gone wrong, and the description of the PCT position specified that the "ability to hear equipment sounds from a distance is required." *Id.* at 108. Because she is deaf, Ms. Osborne cannot hear the equipment sounds or verbal requests for assistance, and the parties agree she could not perform the essential function of donor monitoring without accommodation.

The district court then moved to the second step of the qualification inquiry. Applying the burden-shifting framework to consider whether any reasonable accommodation would enable Ms. Osborne to perform the essential functions of the PCT position, the court concluded Ms. Osborne failed to meet her initial burden because her proposed accommodations were not reasonable. The court therefore granted summary judgment to BioLife. Of the three proposed accommodations at issue on appeal, the

district court rejected (1) job restructuring because it altered the nature of the PCT position, (2) visual or vibrating alerts because Ms. Osborne had not shown such modifications were feasible, and (3) call buttons because they did not completely eliminate health and safety risks and they shifted the essential function of donor monitoring to donors themselves.

### 4. **Ms. Osborne's Proposed Accommodations**

Ms. Osborne argues she demonstrated that her three proposed accommodations—job restructuring, installing visual or vibrating alerts, and providing call buttons to donors—are reasonable on their face and that this should have shifted the burden of proof to BioLife rather than resulting in summary judgment. We agree with the district court that job restructuring is not a reasonable accommodation, but conclude there are genuine disputes of fact as to whether installing visual or vibrating alerts and providing call buttons to donors together would allow Ms. Osborne to perform the essential functions of the position, satisfying her initial burden of showing her proposed accommodations are facially reasonable.[11] This precludes summary judgment at this stage of the litigation and moots the dispute over the proper allocation of costs.

    a. *Job restructuring*

The first accommodation Ms. Osborne identifies was initially proposed by Mr.

---

[11] Because her proposed accommodations address different essential functions, Ms. Osborne has argued that they should be considered in conjunction with one another. *See* Aplt. App. at 282.

Elder.  When Ms. Osborne applied for a position with BioLife, Mr. Elder proposed restructuring the PCT position by having Ms. Osborne work primarily in the sample preparation area and less often in the phlebotomy area where monitoring donors was required.  Mr. Elder testified that the restructuring would lessen, but not eliminate, Ms. Osborne's donor monitoring duties as a PCT.  BioLife, which had recently restructured the position so that all PCTs would assist with medical histories, donor monitoring, and sample preparation, subsequently insisted that Ms. Osborne must be able to perform each of the position's three core tasks.

The district court determined the proposed job restructuring was not a reasonable accommodation because it "fundamentally alters the nature of the PCT position . . . by removing or reducing Ms. Osborne's duty to monitor donors and, in turn, increasing the other PCTs' duty to monitor donors."  Aplt. App. at 500.

Ms. Osborne disagrees with the court's assessment.  She contends the accommodation would not alter the nature of the PCT position, but would merely reallocate the time spent in the sample processing area versus the phlebotomy area where donor monitoring takes place.[12]  She suggests she would spend most of her time in the

_____

[12] Mr. Elder's deposition describes BioLife's concerns about hiring Ms. Osborne and details how he envisioned restructuring the PCT position for her:

I believe—as I recall, they were concerns that we, as a management team, had.  That—that we thought at that time might be overcome by concentrating primarily in the sample prep area.  However, she would still have to be out in the phlebotomy area as a PCT and would—would have to

Continued . . .

-17-

sample preparation area, but would still be engaged in donor monitoring in some capacity, and thus would still be responsible for all of the essential functions of the PCT position. She also argues the reasonableness of job restructuring involves issues of material fact that should not have been resolved at the summary judgment stage.

Ms. Osborne's arguments are unavailing. BioLife asserts that because Ms. Osborne cannot hear the alarms on the plasmapheresis machines or verbal requests for assistance, she cannot safely perform the essential function of donor monitoring. Allowing Ms. Osborne to work primarily (but not exclusively) in the sample preparation area mitigates but does not eliminate BioLife's concerns about her capacity to hear

_____

Cont.

> put sets on, you know, would have to take bags off, and so on—bottles off. So she was going to be in a situation where she's going to be monitoring donor safety. Everyone was going to be in that situation.

Aplt. App. at 94.

> I think my plan would have been to—generally she would not—she wouldn't be in a capacity—she would have been more—it was just in the sample prep role, what was historically the sample prep role, and her time on the floor would have been limited or—in other words—I mean, she would have had to have been trained in all areas. And certainly she could have been adept in putting up sets and disconnecting donors. But as far as monitoring them, probably my goal would have been to—that wouldn't have been something—a situation we would have placed her in on a regular basis. So she would have been trained—she would have had to have been trained all the way through the PCT, but whether she fulfilled on a daily basis the scope of those functions, that—that was my way of making it work, was that she wouldn't—she would be primarily sample prep.

*Id.* at 97.

-18-

alarms and engage in donor monitoring. Reweighting the time spent in different roles is not a reasonable accommodation because it would leave Ms. Osborne responsible at least to some extent for the essential function of donor monitoring that BioLife asserts she is unable to perform.

We have said employees must be able to perform all of a position's essential functions, even if they are rarely called upon to perform them in practice. *See, e.g.*, *Hennagir*, 587 F.3d at 1262-64; *Martin v. Kansas*, 190 F.3d 1120, 1132 (10th Cir. 1999), *overruled on other grounds by Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1176-78 (10th Cir. 1999). And for an accommodation to be reasonable, it must actually enable the employee to perform the essential function at issue. *See Hwang v. Kan. State Univ.*, 753 F.3d 1159, 1161-62 (10th Cir. 2014); *Hennagir*, 587 F.3d at 1264; 29 C.F.R. § 1630.2(o). Ms. Osborne has not shown the proposed accommodation would enable her to perform the essential functions of the PCT position, and therefore has not carried her initial burden of showing the accommodation "seems reasonable on its face." *Barnett*, 535 U.S. at 402.

Under these circumstances, Ms. Osborne failed to carry her initial burden to show job restructuring is a reasonable accommodation. She therefore could not satisfy the second element of a prima facie case of discrimination under the ADA. Ms. Osborne's failure on this accommodation, however, does not foreclose her from making a case for other accommodations.

b. *Visual or vibrating alerts*

The second accommodation Ms. Osborne proposes is to add visual or vibrating alerts to the plasmapheresis machines, which would notify her when the alarms on the machines sound.[13] She argues that this accommodation—adopted in conjunction with call buttons enabling donors to alert her if they are in distress, which we discuss at greater length below—would enable her to perform all of the essential functions of the PCT position.

The district court determined Ms. Osborne had not carried her initial burden of showing strobe lights or vibrating features feasibly could be added to the plasmapheresis machines. On appeal, Ms. Osborne argues she made the required showing that, on its face, adding visual or vibrating alerts to equipment with audible alarms is a reasonable accommodation for a deaf individual. BioLife disagrees. First, it contends the evidence in the record casts doubt on the feasibility of altering the plasmapheresis machines, and argues Ms. Osborne therefore failed to carry her burden on the second step of the prima facie case.[14] Second, it contends that such a modification would only enable Ms.

_____

[13] The record suggests the plasmapheresis machines already have a light that illuminates when the alarm sounds. Ms. Osborne argues an added strobe light or vibrating feature could alleviate any concerns BioLife might have about her inability to notice the illuminated light.

[14] BioLife's argument misconstrues the burden-shifting framework for summary judgment by placing the second burden in that framework—undue hardship for the employer—on Ms. Osborne. In fact, Ms. Osborne must make only the initial showing that the proposed accommodation is reasonable on its face, at which point BioLife bears

Continued . . .

-20-

Osborne to perform the essential function of perceiving the alarm on the plasmapheresis machines and would not enable her to perform the essential function of donor monitoring.[15]

### i. Burden-shifting analysis

We conclude the court misallocated the burden of proof by requiring Ms. Osborne to show not only that her proposed accommodation is reasonable on its face, but also that the accommodation would be feasible for BioLife. For her initial burden on the qualification element of a prima facie case, Ms. Osborne was required to show only that equipment modification for a deaf employee is reasonable on its face. *Mason*, 357 F.3d at 1122. She did. Ms. Osborne offered expert testimony describing individuals with disabilities who were successfully employed in the health care industry because of simple technological interventions. She also provided evidence of a process by which BioLife could request modifications that would add enhanced alert systems to its plasmapheresis machines.

Such modifications are endorsed by ADA's definition of "reasonable

_____

Cont.

the burden to demonstrate undue hardship. *See Mason*, 357 F.3d at 1122.

[15] The district court only addressed the feasibility of visual or vibrating alerts and did not assess whether the direct threat criteria were relevant in assessing any remaining risk. On appeal, BioLife does not dispute that visual or vibrating alerts, if installed, would allow Ms. Osborne to perceive the alarms on the plasmapheresis machines. We limit our discussion here to the district court's analysis, and address the direct threat criteria in our analysis of Ms. Osborne's proposed call button accommodation.

accommodation," which specifically includes "acquisition or modification of equipment or devices." 42 U.S.C. § 12111(9)(B). The EEOC has said the use of appropriate emergency notification systems—like strobes or vibrating pagers—is one form of reasonable accommodation for a deaf employee, including those in health care settings. *See* EEOC, *Questions and Answers about Deafness and Hearing Impairments in the Workplace and the Americans with Disabilities Act*, § 9, http://www.eeoc.gov/eeoc/publications/qa_deafness.cfm (last accessed Aug. 6, 2015); EEOC, *Questions and Answers about Health Care Workers and the Americans with Disabilities Act*, http://www.eeoc.gov/facts/health_care_workers.html (last accessed Aug. 6, 2015). We consider Ms. Osborne's showing sufficient to carry her burden of demonstrating that the accommodation "seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *Barnett*, 535 U.S. at 402.

Upon Ms. Osborne's satisfying this burden, the burden of production shifted to BioLife, which was required to show the proposed accommodation is not feasible or would constitute an undue hardship. *See id.*; *Mason*, 357 F.3d at 1122. Considerations about how much alarms would cost, when they could be added in the production process, and who would install them are not part of Ms. Osborne's initial burden. Instead, they are considerations BioLife, as the employer, must identify with specificity to illustrate why the proposed accommodation constitutes an undue hardship and is thus unreasonable. Allocating burdens in this fashion recognizes that employees are ill-equipped to demonstrate that an accommodation is feasible for an employer. Instead, the

-22-

employer can more readily identify why an accommodation is not feasible under the ADA.

The only evidence in the record on the feasibility of equipment modifications is the testimony of a BioLife employee, who indicated BioLife was unable to modify the machine and any modifications would have to be requested through its vendor. Aplt. App. at 501-02. Merely noting that modifications would require BioLife to contact its vendor does not show undue hardship and fails to satisfy BioLife's burden of showing it would be infeasible to implement Ms. Osborne's proposed accommodation.[16] Although

_____

[16] The record testimony from BioLife employees does not illustrate they investigated the possibility of equipment modifications or established it would constitute an undue hardship:

> Q: . . . Did Baxter/BioLife give any consideration to modifying the alert and alarm lights on the plasmapheresis machine as an accommodation for Ms. Osborne?
> A: I believe that was discussed, but those machines cannot be altered. They are regulated by the FDA, and so we are not at liberty to make changes to the machines.
> Q: And what's your basis for saying that? Are you referring to a regulation that you've read?
> A: No. I'm familiar with the fact that we've had these machines.

Aplt. App. at 327 (quoting Sheila Stachura).

> Q: . . . [I]s it your understanding that modification of a 510(k) medical device is prohibited by the FDA? If you know.
> A: No, it's not prohibited. It's a process that would have to—a lengthy process, and we would have to go through our vendor.

*Id.* at 362 (quoting Sherrie Stevenson).

-23-

the services of an experienced vendor may be necessary to modify many types of medical equipment, BioLife has not shown the specific modifications proposed here are costly or difficult, leaving a question of fact for the jury. We therefore conclude the district court's grant of summary judgment on this accommodation was premature.

### ii. Incomplete accommodation

Although we conclude Ms. Osborne showed her proposed accommodation is reasonable on its face and BioLife did not show undue hardship, we agree with BioLife that Ms. Osborne's proposal would not allow her to perform the full range of essential functions of the position unless additional accommodations are adopted. The visual and vibrating alerts would address BioLife's concern about the plasmapheresis machines, but would not enable Ms. Osborne to perform the essential function of donor monitoring. Ms. Osborne does not dispute that some incidents demanding her attention would not trigger the plasmapheresis alarms. At best, adding visual or vibrating alerts would alert Ms. Osborne to some portion of the concerns that might arise during the donation process. They would not alert her to donors' physiological reactions that have little or nothing to do with the functioning of the machines. As we note above, a reasonable accommodation, by definition, must enable an employee to perform the essential functions of a position. *See* 29 C.F.R. § 1630.2(o).

### iii. Conclusion

We conclude summary judgment was inappropriate insofar as Ms. Osborne demonstrated an issue of material fact as to whether visual or vibrating alerts would

enable her to perceive the alarms on the plasmapheresis machines. This determination does not merit reversal, however, unless Ms. Osborne's remaining accommodation, in tandem with the visual and vibrating alerts, would permit her to perform the other essential functions of the PCT position. Because Ms. Osborne argued her accommodations should be considered in conjunction with one another, *see* Aplt. App. at 282, we turn to her final accommodation to resolve the appeal.

c. *Donor call buttons*

The third accommodation Ms. Osborne proposes is to issue call buttons to donors to notify her if they experience discomfort or distress. The district court concluded this accommodation did not satisfy the second element of a prima facie case of discrimination. It determined that the potential of a donor's severe reaction, even if statistically de minimis, was sufficient to show that call buttons are not a reasonable accommodation. It also concluded that issuing a call button to donors was unreasonable because it would place the onus on donors to alert Ms. Osborne to their adverse reactions, and donors in distress may be impaired in their ability to use these tools.

The parties agree that perceiving and responding to donor reactions is an essential function of the PCT position. Mr. Elder testified that the BioLife facility experienced roughly four to five significant adverse reactions annually.[17] BioLife's expert recalled

---

[17] A "significant" adverse reaction is one where a donor required medical attention outside the center. Aplt. App. at 91. Mr. Elder noted, "And that probably wouldn't be, you know, an ambulance coming. That would be us recommending that they have some

Continued . . .

-25-

seven adverse reactions over the previous three years—five of these required a nurse to administer epinephrine to a donor and arrange for transportation to a hospital and the other two involved falls by donors who became dizzy. Because adverse reactions increase in severity over time, however, BioLife stresses that prompt responses are important. As BioLife's Associate Medical Director testified, relatively minor adverse reactions can progress to serious conditions without swift intervention. *See* Aplt. App. at 120-22. BioLife observes that all PCTs in the donor area must be capable of promptly perceiving and responding to adverse reactions because other PCTs may be occupied with other duties. The question before us is whether call buttons would enable Ms. Osborne to perform the essential function of donor monitoring. Our answer is that a jury should decide.

i. Ms. Osborne's arguments

On appeal, Ms. Osborne argues that call buttons are a reasonable accommodation that would allow her to perform the essential function of donor monitoring. First, Ms. Osborne suggests that to determine whether she can safely perform the essential functions of the PCT position, we must consider whether she is a "direct threat," which the ADA defines as "a significant risk to the health or safety of others that cannot be eliminated by

---

Cont.

additional treatment." Aplt. App. at 91. The record does not indicate whether those four or five reactions also triggered the alarm on the plasmapheresis machine, such that Ms. Osborne's proposed visual or vibrating alerts would have sufficed to alert her when they occurred.

-26-

reasonable accommodation." 42 U.S.C. § 12111(3). Ms. Osborne emphasizes the plasma donation process is safe and has historically carried a low risk—about 0.0004%—of significant adverse donor reactions, and that she would be able to attend to those reactions using call buttons in spite of her hearing impairment. She argues the district court erred in assuming that any de minimis risk of harm would be unacceptable and in ignoring the comparative risk of a hearing PCT providing an inadequate response.

Second, Ms. Osborne contends a call button would allow her to perform the essential function of donor monitoring. Joe Schaffner, an expert in adaptive technology for persons with disabilities, testified that donors could have been provided with a call button system that would visually alert Ms. Osborne that a donor needed her attention. Ms. Osborne notes this would be similar to call buttons in hospitals, where patients use them to contact a nurse. Like a call button in a hospital or an airplane, Ms. Osborne argues the button could indicate the source of the request, and even if the specific source were not identified, Ms. Osborne could ask who needs assistance and quickly survey the room. She further notes that when a donor has a reaction, a PCT must get help from a senior PCT. *See* Aplt. App. at 291-92, 295, 333, 368. To perform the essential function of donor monitoring, Ms. Osborne must only be able to recognize that a patient is in distress and get help, which she would be equipped to do with the call button accommodation. She therefore argues she is qualified with reasonable accommodations and satisfies the second element of the prima facie test under the ADA.

### ii. BioLife's arguments

BioLife contends call buttons would be insufficient to allow Ms. Osborne to perform the essential function of donor monitoring. First, BioLife contends we need not consider whether Ms. Osborne constitutes a "direct threat" to health and safety in the PCT position. Instead, it is enough that Ms. Osborne has not shown she can perform the essential functions of the position and therefore is not a qualified individual under the ADA.

Second, BioLife argues call buttons are not a reasonable accommodation because an adverse reaction may impair the donor's ability to recall or follow instructions on using the call button, particularly because some adverse reactions cause donors to become confused, incoherent, or temporarily disabled. BioLife contends it would be more difficult for donors to remember to push a button to alert Ms. Osborne than it would be for them to follow a natural instinct to call out for help. It also notes that when a call button alert sounds, Ms. Osborne would still have to determine which of the donors in the section—from as many as 18 people—had sounded the alarm, which may delay her response.

### iii. Analysis

To address the call button accommodation, we first clarify how we evaluate essential functions that implicate the health and safety of others, and then consider whether Ms. Osborne has carried her initial burden by identifying a facially reasonable accommodation. We conclude Ms. Osborne has raised a genuine issue of material fact as

to whether the call buttons, used in conjunction with visual or vibrating alerts, would allow Ms. Osborne to perform the essential function of donor monitoring, making summary judgment inappropriate.

### 1) The direct threat criteria applied

BioLife's sole concern is whether Ms. Osborne can safely perform the essential function of donor monitoring. It does not argue that Ms. Osborne would be unable to perform this function as a general matter, but instead argues there are limited circumstances where she might be unable to perceive adverse donor reactions and respond as swiftly as a hearing person. BioLife therefore contends it must prevail so long as Ms. Osborne, working with the benefit of her proposed accommodations, poses a de minimis risk to donors. As noted above, BioLife misapprehends ADA law. To prove the prima facie case element that she is "qualified" for the PCT position, Ms. Osborne must show she would be able to perform the essential functions of the position without endangering others. The direct threat criteria from *Arline* determine whether Ms. Osborne demonstrated her proposed accommodation is reasonable on its face and met her initial burden.

Ms. Osborne points to evidence in the record that the plasma donation process is safe and has historically carried a low risk—about 0.0004%—of significant adverse donor reactions. BioLife argues an employer may require employees to be able to perform all of the essential functions of a position "even if some of those essential functions are rarely required or required only when demand for the function arises."

Aplee. Br. at 17.  It points to Tenth Circuit precedent establishing the principle that employers need not excuse employees from essential functions simply because those functions are rare.  *See, e.g.*, *Hennagir*, 587 F.3d at 1262-64; *Martin*, 190 F.3d at 1132; *Anderson*, 181 F.3d at 1176-78.  Based on this principle, BioLife contends Ms. Osborne's accommodation is unreasonable because she would be unable to perform the essential function of donor monitoring in rare—0.0004%—instances of significant adverse reactions.

BioLife misconstrues both these cases and Ms. Osborne's argument.  The cases address the likelihood that an employee will have to perform a particular essential function in the course of employment, not the likelihood that a particular set of factual circumstances might arise that could preclude an employee's ability to perform that function.  Ms. Osborne is not arguing that she should be excused from any aspect of donor monitoring—to the contrary, her argument for the installation of call buttons indicates she expects to engage in that function.  She argues she can perform the essential function of donor monitoring with reasonable accommodation, and the potential mishaps BioLife identifies are so remote and hypothetical that they do not implicate her ability to perform that function.[18]  We therefore consider whether she could perform the essential

---

[18] *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758 (5th Cir. 1996), is instructive.  Ms. Rizzo had a hearing impairment.  Her job as a teacher's aide included driving the school van.  Concerned about her ability to hear a choking child while driving the van, her employer relieved Ms. Rizzo of her driving duties.  She ultimately resigned and sued under the ADA.  The district court granted summary judgment for the employer.

Continued . . .

functions of the position using the direct threat criteria.

Both *Arline* and the EEOC regulations identify the nature, duration, severity, and probability of the risk as relevant factors in our inquiry. 480 U.S. at 288; 29 C.F.R. § 1630.2(r). The parties here focus primarily on probability and severity. Because the specific kinds of donor reactions and attendant factual circumstances BioLife identifies are neither likely nor in each instance necessarily serious, they do not undermine Ms. Osborne's ability to fulfill the essential function of donor monitoring with reasonable accommodations.

The significant adverse reactions BioLife identifies are historically rare, occurring in about 0.0004% of donations.[19] BioLife does not dispute that Ms. Osborne will be able

---

Cont.

The Fifth Circuit reversed. On the issue of whether Ms. Rizzo was qualified—the second element of her prima facie case—the court said: "the question is whether the person is able to safely drive the van and not present a direct threat to the children's safety." *Id.* at 763. Applying the *Arline* direct threat criteria, and noting that "[n]o evidence was presented regarding the ability of anyone to hear a choking child while driving a van," *id.* at 764, and that Ms. Rizzo presented "evidence showing that it was safe for her to drive the van," *id.*, including evidence she could hear emergency vehicles, *id.*, the court concluded "there exists a genuine issue of material fact as to whether Rizzo is a direct threat, and thus, whether she was a qualified individual with a disability," *id.* As in *Rizzo*, the record in this case contains no evidence—just speculation—that Ms. Osborne, working with the benefit of her proposed visual or vibrating alert and call button accommodations, would present a direct threat to others, and therefore presents at least as strong a case against summary judgment. *See also Branham*, 392 F.3d at 905-09.

[19] We further note the significant adverse reactions BioLife identifies are not necessarily severe. Although adverse reactions can be serious, in many instances the potential harm to donors is both minor and temporary. The FDA defines the universe of

Continued . . .

to deal with nearly all of the reactions that donors may experience.  Instead, it argues that so long as there is a risk that (1) a donor will experience a significant adverse reaction—a 0.0004% risk—*and* (2) the reaction is a type that is not picked up by the visual or vibrating alerts on the plasmapheresis machine, *and* (3) the reaction is a type that prevents the donor from pressing the call button but would not prevent the donor from calling out, *and* (4) Ms. Osborne's back happens to be turned at the time of the distress, *and* (5) other donors do not assist in getting anyone's attention, Ms. Osborne might be unable to perform the essential function of responding to that donor and getting help from a senior PCT.  The infinitesimal risk of these hypotheticals occurring simultaneously— which is much less than 0.0004% when the risk of adverse reaction is multiplied by the probability of the other occurrences[20]—does not come anywhere close to constituting a "direct threat."  Indeed, nothing in the record establishes whether or how often

_____

Cont.

"adverse reactions" to include things like "lightheadedness, fainting, nausea, tingling, flushing, wheezing, chest pain, low blood pressure, rapid heart rate, low back pain, bronchial spasms, difficulty breathing, loss of consciousness, and convulsions."  Aplt. App. at 113.  So long as these result in a recommendation for follow-up care, they may be characterized as "significant."  Aplt. App. at 91.  BioLife notes minor reactions can become severe over time, but the severity of adverse reactions and their physical consequences varies widely and is mitigated by timely intervention.  Whether Ms. Osborne can intervene in a timely manner with reasonable accommodation is a question of fact for a jury.

[20] Even if the factors are not independent variables for purposes of using the product rule to yield a probability, the number will still be much less than 0.0004%.  *See* Paul C. Giannelli & Edward J. Imwinkelried, Scientific Evidence § 15.07 (4th ed. 2007).

-32-

occurrences (2) through (5) would occur. "Whether one is a direct threat is a complicated, fact intensive determination, not a question of law. To determine whether a particular individual performing a particular act poses a direct risk to others is a matter for the trier of fact to determine after weighing all of the evidence about the nature of the risk and the potential harm." *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 764 (5th Cir. 1996). Permitting employers to obtain summary judgment by identifying such unlikely scenarios would eliminate ADA protection for disabled individuals working in professions where they might be tasked with the health and safety of others. *See Justice v. Crown Cork & Seal Co., Inc.*, 527 F.3d 1080, 1092 n.5 (10th Cir. 2008).

To shift the burden of proof to BioLife, Ms. Osborne must show only that her proposed accommodation is reasonable on its face; that is, it would permit her to perform the essential function at issue—here, donor monitoring. She need not show that the accommodation would eliminate every de minimis health or safety risk that BioLife can hypothesize. *See id.* at 1091-92. Because significant adverse donor reactions are highly improbable and not always serious, and because no record evidence shows Ms. Osborne would be unable to handle them, we cannot conclude they render Ms. Osborne unqualified as a matter of law to perform the essential function of donor monitoring. *See Arline*, 480 U.S. at 288 (determining "the resolution of whether Arline was otherwise qualified requires further findings of fact"). A reasonable jury could find otherwise. Whether the risk of a series of hypotheticals occurring is sufficiently real, whether any

such risk is any greater than one pertaining to a hearing person, and whether any such risk renders Ms. Osborne unqualified to perform the essential function even with the aid of reasonable accommodations are questions of fact for the jury, not questions for the district court to decide as a matter of law.

Although we reject the argument that *any* de minimis risk to health and safety merits summary judgment, this determination does not necessarily mean that Ms. Osborne's proposed accommodation is reasonable on its face. To survive summary judgment, Ms. Osborne must also show that call buttons would make her qualified to perform the essential function of donor monitoring.

### 2) Ms. Osborne's reasonable accommodation showing and BioLife's other arguments

In addition to its de minimis risk argument addressed above, BioLife makes two related objections to the call button accommodation: (1) donors may find it difficult to use and should not be required to do anything other than call out if they need assistance, and (2) Ms. Osborne may not be able to determine who pressed the call button, resulting in delayed identification of a donor in distress. These arguments address whether Ms. Osborne can meet her initial burden to show her proposed accommodation is reasonable on its face.[21] Construing the evidence in her favor, we conclude she has sufficiently shown a triable issue as to whether the accommodation is reasonable.

---

[21] BioLife does not contend providing call buttons would constitute an undue hardship. We therefore limit our analysis to whether call buttons are facially reasonable.

Through expert testimony and EEOC guidelines, Ms. Osborne has demonstrated the call buttons would alert her to a donor experiencing an adverse reaction. She also has shown she is a skilled lip reader and contends she can communicate effectively with a donor having an adverse reaction or notify a senior PCT. Unless BioLife's two arguments convince us otherwise, Ms. Osborne has carried her "not onerous" burden of identifying an accommodation that is reasonable on its face. *Hawkins*, 778 F.3d at 883 (quoting *Plotke*, 405 F.3d at 1099).

First, BioLife contends the call button is unreasonable on its face because it is insufficient to alert PCTs. BioLife argues donors may not be familiar with the call button system or remember to press the button and will find it more natural to call out for help. But this is purely speculative, and BioLife does not support these assertions with any proof. As Ms. Osborne points out, call buttons are common in hospitals and other medical settings, and there is no indication they would be insufficient in the plasma donation context. BioLife suggests donors suffering a significant adverse reaction— again, a 0.0004% risk—may lose consciousness, become less and less alert, or suffer seizures, but these problems are not unique to pushing a call button; presumably, a donor who loses consciousness would also be unable to verbally call out or make noise to alert a hearing PCT.[22] Whether donors are capable of using a call button system and whether

---

[22] Nor are verbal cues and call buttons mutually exclusive. Ms. Osborne's proposed accommodation would allow donors to either verbally *or* visually request help from the PCTs working in the area, who collectively monitor the donors in the donation

Continued . . .

call buttons would materially affect their ability to alert the PCT in the event of an adverse reaction are questions of fact for the jury.[23]

As part of this argument, BioLife asks us to affirm the district court's determination that the accommodation is unreasonable because the call buttons would put the onus of monitoring on the donor. We do not because the call button would not put any more onus on the donor than the donor already bears. Ms. Osborne, like a hearing PCT, can visually assess the room when she is facing donors. When her back is turned, a donor will have to press the call button. When a hearing PCT's back is turned, a donor will have to call out or make a physical noise. In both cases, the donor must get a PCT's attention. The method of alerting a PCT differs, but the burden of alerting a PCT remains on the donor in both instances. Whether Ms. Osborne would be any less able to respond than a hearing PCT in this circumstance is a factual question a jury should decide.

Second, BioLife contends call buttons are unreasonable on their face because when an alert sounds, Ms. Osborne would still have to determine who sounded the alarm,

_____

Cont.

area. Such an arrangement would likely be safer and more comprehensive than verbal cues alone. *See* Aplt. App. at 282 (arguing for accommodations working in tandem).

[23] BioLife contends the call button is insufficient because it is less effective than a verbal request. Even if BioLife had offered factual support for this assertion in the record—and it has not—it would not prove Ms. Osborne's accommodation is unreasonable. Ms. Osborne must show her accommodation will allow her to perform the essential function of donor monitoring; as long as she is able to perform the essential function, we are unaware of any case law requiring that she be able to do it identically to a non-disabled person.

thereby delaying her response. As an initial matter, BioLife could easily resolve this problem by having each call button illuminate an individual light over the relevant donor, as is common in airplanes, hospitals, and other settings where call buttons are used. More significantly, the record does not establish that the time it takes for Ms. Osborne to identify a donor in distress would be any different from a hearing employee turning around and trying to identify a donor in distress based on a verbal alert. BioLife has not supported its assertion that Ms. Osborne's identification of the donor in distress would produce a delay, nor has it shown that any delay that does occur would render Ms. Osborne unable to perform the essential function of donor monitoring.[24]

Because Ms. Osborne has shown the call-button accommodation is reasonable on its face, and because BioLife has not shown Ms. Osborne's proposed accommodation is unreasonable as a matter of law, BioLife bears the burden of showing call buttons are infeasible or an undue hardship. It has not made that showing. Ms. Osborne's ability to perceive and respond to adverse donor reactions is a question of fact for a jury to decide.

---

[24] BioLife has not identified objective criteria for the essential function of donor monitoring, nor does the evidence suggest that BioLife generally assesses the perception or reaction times of incoming employees. The lack of objective criteria makes this case different from cases like *Hennagir*, 587 F.3d at 1259, where a correctional officer was unable to complete a physical safety training requirement, *Hawkins*, 778 F.3d at 881, where a facility supervisor was unable to obtain required Department of Transportation certification to drive the employer's vehicles, or *Milton*, 53 F.3d at 1120, where warehouse employees were unable to meet defined production standards. The lack of discrete criteria makes it difficult, if not impossible, for us to say that *any* potential delay would make Ms. Osborne unable to perform the essential function of donor monitoring as a matter of law.

5. **Verbal Communication**

In its filings before the district court, BioLife identified verbal communication as an essential function of the PCT position, and each party presented competing evidence regarding Ms. Osborne's abilities to communicate verbally. The district court, however, did not address Ms. Osborne's verbal communication skills in its ruling. Instead, it specifically granted summary judgment on the basis that she could not perform the essential function of donor monitoring.

We have said "[a]n issue is preserved for appeal if a party alerts the district court to the issue and seeks a ruling." *Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1150 (10th Cir. 2012) (quotations omitted). Both parties alerted the district court to the essential function of verbal communication, and both reiterate their arguments on appeal. Because we believe the record is fully developed on this point, we opt to resolve the issue before remanding the case to the district court.

After reviewing the record, we conclude there is a genuine dispute of material fact as to whether Ms. Osborne could perform the essential function of verbal communication. BioLife employees testified they did not recall discussing whether Ms. Osborne could speak clearly when deciding to revoke her offer of employment. Mr. Elder indicated he was "impressed with her ability to communicate" and "felt she could communicate effectively in the workplace." Aplt. App. at 95, 307-08. BioLife presented expert testimony to the contrary, but BioLife's expert did not meet Ms. Osborne or personally test her abilities, and the record does not suggest the expert has visited the BioLife

facility or is familiar with its day-to-day operations. BioLife suggests Ms. Osborne's ability to read lips may be impaired when a donor is having a significant adverse reaction, but BioLife does not contend Ms. Osborne would be unable to give orders or instructions under those circumstances, nor does it establish that donors experiencing significant adverse reactions would be able to communicate with hearing individuals unimpeded. Based on this record, we believe that whether Ms. Osborne can perform the essential function of verbal communication is a genuine issue of material fact, and that summary judgment on this ground would be improper.

* * *

Because Ms. Osborne's ability to respond to donor reactions involves disputes of material fact and BioLife has not illustrated that using call buttons in conjunction with visual and vibrating alerts would be unreasonable as a matter of law, we reverse the grant of summary judgment and remand for further proceedings.

## B. *Allocation of Costs*

BioLife argues Federal Rule of Civil Procedure 54(d)(1) generally requires that costs be awarded to the prevailing party. We have said that Rule 54 creates a presumption that costs will be awarded, and that if district courts decline to award costs to the prevailing party, they must provide a reason for doing so. *See Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1288 (10th Cir. 2012). BioLife argues that because the district court did not give a basis for its decision not to award costs, we should reverse the award.

BioLife's argument is premised on the determination that it is the prevailing party,

and because we reverse and remand the grant of summary judgment, that determination is moot. On remand, the district court will have an opportunity to allocate costs as it sees fit in light of the proceedings to follow.

## III. **CONCLUSION**

Because Ms. Osborne marshalled sufficient evidence to avoid summary judgment and BioLife offered insufficient proof to show an absence of factual dispute, under the burden-shifting framework for an ADA case, we reverse the district court's grant of summary judgment to BioLife. We therefore deem BioLife's cross-appeal for costs moot and remand to the district court.