**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 18, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

STEPHEN MANNAN,

　　Plaintiff - Appellant,

v.

THE STATE OF COLORADO,

　　Defendant - Appellee.

No. 20-1077
(D.C. No. 1:18-CV-01844-MSK-SKC)
(D. Colo.)

_____

**ORDER AND JUDGMENT\***
_____

Before **LUCERO**, **MATHESON**, and **PHILLIPS**, Circuit Judges.
_____

Stephen Mannan sued the State of Colorado. He claimed the Colorado

Department of Corrections ("CDOC") violated the Vocational Rehabilitation Act of 1973

("Rehabilitation Act") when it terminated him from his Correctional Officer ("CO")

position after failing to provide a reasonable accommodation for his arthritic hip

disability. The district court granted summary judgment for the State. Exercising

jurisdiction under 28 U.S.C. § 1291, we affirm.

---

\* This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.  BACKGROUND

### A.  *Legal Background*

The Rehabilitation Act allows suit by individuals with disabilities "who have been subjected to discrimination by the federal government or by a program or activity receiving federal financial assistance."  *McGeshick v. Principi*, 357 F.3d 1146, 1149 (10th Cir. 2004) (citing 29 U.S.C. § 794a).  The same standards that apply to claims under the Americans with Disabilities Act of 1990, as amended ("ADA"), also apply to Rehabilitation Act claims.  *See Woodman v. Runyon*, 132 F.3d 1330, 1339 n.8 (10th Cir. 1997).

A Rehabilitation Act plaintiff "must establish a prima facie case of employment discrimination," *McGeshick*, 357 F.3d at 1150, which has four elements:

> (1) "the plaintiff is disabled under the Act";
>
> (2) "he would be 'otherwise qualified' to participate in the program";
>
> (3) "the program receives federal financial assistance (or is a federal agency)"; and
>
> (4) "the program has discriminated against the plaintiff."

*Id.*  In this case, only the second element is at issue.

B. *Factual Background*

1. **Initial Employment as a Correctional Officer**

In 2013, Mr. Mannan began working for CDOC as a CO at the Denver Reception and Diagnostic Center ("DRDC").[1]

CDOC's position description for a CO describes the position's "basic purpose" as being responsible for "[m]aintain[ing] safety and security of facility and work sites." App., Vol. 1 at 114. COs "enforce[] security procedures." *Id.* About 30 percent of COs' time is spent on "counts, searches, inspections, and emergencies." *Id.* at 115 (all-capitalization omitted). To fulfill this duty, they must be able to "respond[] to fights, fires, suicide attempts, hostage situations, [and] riots," which can require "subdu[ing] offenders by applying appropriate Use of Force techniques." *Id.*[2]

To accomplish these duties, CDOC has identified "essential functions" that COs must perform. *See id.* at 114, 119 (all-capitalization omitted). The position description states these essential functions entail various "physical demands," *id.* at 119 (all-capitalization omitted), such as

> CONTROL OF OTHERS – seizing[,] holding[,] controlling,
> and/or otherwise subduing violent[,] assaultive, or physically

---

[1] The "DRDC . . . serves primarily to classify offenders entering CDOC custody and identify any special needs." App., Vol. 2 at 177. The facility "houses inmates of all security classifications." *Id.* at 178.

[2] CDOC's job analysis for COs states that they must be "[a]b[le] to use physical force to control a situation." *See* App., Vol. 1 at 93. The job analysis "summarizes the job requirements for the position." App., Vol. 2 at 181.

threatening persons to defend oneself or prevent injury. Body strength and agility of all four limbs is necessary.

*Id.* at 120. Other physical essential functions include:

- "climbing,"

- "kneeling,"

- "crouching,"

- "balancing," and

- "exert[ing] in excess of 100 [pounds] of force."

*Id.* at 119 (all-capitalization omitted).[3]

### 2. Onset of Medical Issues

In January 2017, Mr. Mannan experienced "chronic hip pain." *See id.* at 56. He was diagnosed with osteoarthritis and told he would need a hip replacement. Mr. Mannan was morbidly obese. His doctor advised him to lose approximately 50 pounds before surgery.

### 3. Initial Leave

In February 2017, Mr. Mannan took leave under the Family and Medical Leave Act ("FMLA"). His "aim . . . was to have . . . surgery done in March or April," but he did not do so. *See* App., Vol. 2 at 226.

---

[3] CDOC's job analysis also states that COs must be "[a]b[le] to climb stairs and walk on hard surfaces throughout [a] shift." App., Vol. 1 at 93.

4

Instead, in March 2017, he returned to DRDC and worked for the next several months.  His condition deteriorated during this time.  Toward the end of June 2017, he again took time off work.

### 4. **Transitional Assignment in the Control Room**

#### a. *Start of assignment*

On July 6, 2017, Mr. Mannan provided CDOC with a "Fitness-to-Return Certification" ("FTR")—a CDOC form that allows a health care provider to state whether an employee can return to work and if so, under what restrictions.  *See* App., Vol. 1 at 94-95.  Mr. Mannan's FTR said he could work with the following restrictions until August 1, 2017:

- "no bending/stooping/squatting";

- "no kneeling";

- "no crawling";

- "no standing for more than 1 hour[] each day";

- "no walking for more than 1 hour[] each day";

- "no working/climbing on elevated equipment";

- "no assaultive, physical control, and/or arrest situations";

- "no use . . . of lower extremity"; and

- "no weight bearing on [his] r[ight] hip . . . for longer than 1 h[our] [at] a time."

*Id.* at 95.

CDOC informed Mr. Mannan that "[d]ue to the nature of [the] restrictions, and due to the needs of the facility," it could not provide him with a placement that would "adequately meet [his] work restrictions." *Id.* at 96.

On July 13, 2017, Mr. Mannan submitted a new FTR listing the following work restrictions as necessary until August 13, 2017:

- "no standing for more than . . . 1 h[our] at a time" and

- "no walking for more than . . . 30 min[utes] at a time."

*Id.* at 98.

In response, the DRDC Warden, Ryan Long, provided Mr. Mannan with a "transitional duty assignment," from July 17, 2017, to August 13, 2017, to the DRDC control room. *See id.* at 99 (all-capitalization omitted); App., Vol. 2 at 182.[4]

The control room, also known as the Master Control Unit ("MCU"), functions as the prison's "command center." *See* App., Vol. 2 at 222; App., Vol. 3 at 296. Postings there include both sedentary and non-sedentary work. Sedentary tasks include answering

---

[4] Typically, "Correctional Officers rotate through a variety of posts." *See* App., Vol. 2 at 178. This practice "ensures that the facility is able to maintain the staffing levels required by law despite . . . chronic job vacancies," and it satisfies the need to "accommodate employees who are ill, or who take holidays and/or annual leave." *See id.* at 178-79.

CDOC can, however, accommodate some medical work restrictions by providing COs with a "temporary work assignment," or "[t]ransitional duty." *See id.* at 181-82. Transitional duty "is intended only to assist employees with temporary medical conditions" and "is not intended to provide light duty positions to employees with physical limitations on a long-term or semi-permanent or permanent basis." App., Vol. 3 at 342. It is "offered at [the warden's] discretion," and may be "terminate[d] . . . at any time, based on the business needs of the facility." *See* App., Vol. 2 at 181-82.

6

phones and radios, coordinating officers' schedules, and distributing equipment. Non-sedentary tasks include conducting headcounts, assisting with meal service, and escorting civilians around the facility. During Mr. Mannan's temporary assignment to the control room, he performed only sedentary duties.

b. *End of assignment*

In August 2017, Mr. Mannan submitted another FTR, which reported that his prior restrictions—limiting standing to an hour and walking to 30 minutes—should continue for another three months, until November 13, 2017. On August 23, CDOC notified Mr. Mannan that, considering his work restrictions, a placement was no longer available for him.

5. **Exhaustion of Leave**

After Mr. Mannan's removal from his transitional assignment, he went back on leave and began receiving disability benefits. He still did not undergo surgery.

While on leave, Mr. Mannan continued to submit FTRs. In November 2017, he submitted an FTR stating his prior restrictions should continue for another three months until February 2018. Warden Long again informed him that CDOC did not have a suitable placement. In January 2018, Mr. Mannan submitted an FTR extending these restrictions until August 2018.

On January 22, 2018, Warden Long informed Mr. Mannan by letter that he had exhausted his leave.[5]

### 6. Information Sharing Meeting and Application for ADA Accommodation

Warden Long's January 22 notification also informed Mr. Mannan of an "information sharing meeting . . . to discuss [Mr. Mannan's] leave and status with [CDOC]." App., Vol. 1 at 111. The meeting would include a representative for the warden and other human resource personnel, including ADA coordinator Jennifer Murphy. Warden Long also provided Mr. Mannan with the form CDOC uses for employees to request an ADA accommodation.

On January 29, 2018, Mr. Mannan attended the meeting. On January 31, he submitted his ADA accommodation request, which noted that he had had a "bad hip" beginning in January 2017 and was "unable to stand or walk for extended periods of time." *Id.* at 136. As an accommodation, he requested a "more sedentary position that does not require extensive walking or standing." *Id.*

On February 1, 2018, Ms. Murphy sent a response to Mr. Mannan. She requested additional information from him and his health care provider. The provider's response stated that Mr. Mannan's work restrictions included:

- "no balancing, climbing, stooping, kneeling, or crawling";

---

[5] The letter stated Mr. Mannan's FMLA leave ended in October 2017. His annual leave, sick leave, and short-term disability benefits ended in January 2018.

- "no heavy lifting or moving 20 pounds on a constant basis";

- "no walking more than 30 minutes or standing more than an hour";

- "no working in situations involving assaultive behavior, physical control of another person, and/or restraint situations"; and

- "no self-defense training."

*Id.* at 130-31.

Ms. Murphy determined that, because of these restrictions, "Mr. Mannan could not work as a Correctional Officer." *Id.* at 131. She also could not find any other open positions for which Mr. Mannan was qualified.[6] On March 16, 2018, she notified Mr. Mannan that no suitable positions were available.

7. **Termination**

On March 19, 2018, Warden Long notified Mr. Mannan that he had been "administratively separate[d] . . . from employment." *Id.* at 112.

C. *Procedural Background*

Following his termination, Mr. Mannan sued the State of Colorado in federal court claiming that CDOC violated Section 504 of the Rehabilitation Act by failing to provide him with a reasonable accommodation.

---

[6] The open positions needed self-defense certification, which requires attending a physically demanding course. Mr. Mannan's certification expired on September 30, 2017.

The State moved for summary judgment, arguing that Mr. Mannan was not a "qualified individual" under the Act. The district court found that "Mr. Mannan ha[d] not carried his burden of demonstrating that he was a 'qualified individual with a disability' for purposes of the Rehabilitation Act," and thus granted the motion. *See* App., Vol. 3 at 357.

Mr. Mannan appeals.

## II. **DISCUSSION**

### A. *Standard of Review*

We review de novo the district court's grant of summary judgment, applying the same standard as the district court. *See Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the facts in the light most favorable to the nonmovant—here, Mr. Mannan—and draw all reasonable inferences in his favor, *see Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013), but "unsupported conclusory allegations do not create a genuine issue of fact," *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1037 (10th Cir. 2011) (brackets and quotations omitted).

### B. *Additional Legal Background - The "Otherwise Qualified" Requirement*

The parties contest only the second element of a prima facie Rehabilitation Act case—whether the plaintiff is "otherwise qualified" for the position. *See McGeshick*, 357 F.3d at 1150. An "otherwise qualified" individual is "one who 'with or without

10

reasonable accommodation, can perform the essential functions of the employment position.'" *Jarvis v. Potter*, 500 F.3d 1113, 1121 (10th Cir. 2007) (quoting 42 U.S.C. § 12111(8)).

Determining whether a plaintiff satisfies this element requires "a two-step inquiry":

> First, the court determines whether the individual can perform the essential functions of the job.
>
> Second, if (but only if) the court concludes that the individual is unable to perform the essential functions of the job, the court determines whether any reasonable accommodation by the employer would enable her to perform those functions.

*Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1267 (10th Cir. 2015) (brackets and quotations omitted).

This "determination . . . must be made as of the time of the [allegedly discriminatory] employment decision." *Frazier v. Simmons*, 254 F.3d 1247, 1256 (10th Cir. 2001) (quotations omitted).

## C. *Analysis*

Mr. Mannan cannot establish the "otherwise qualified" prima facie element because he cannot show (1) he could perform the essential functions of the CO position, or that (2) a reasonable accommodation would have enabled him to perform these essential functions.

11

## 1. Essential Functions

Under the first step of the "otherwise qualified individual" inquiry, we conclude that Mr. Mannan cannot show he was able to perform the essential functions of his CO position.

### a. *Additional legal background*

#### i. Definition

"Essential functions" are the "fundamental job duties of the employment position," not the "marginal functions." 29 C.F.R. § 1630.2(n)(1). A job function is essential when "the reason the position exists is to perform that function" or there is a "limited number of employees available among whom the performance of that job function can be distributed." *See id.* § 1630.2(n)(2)(i)-(ii).

"Evidence of whether a particular function is essential includes, but is not limited to," the following:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function; [and]
>
> (iv) The consequences of not requiring the incumbent to perform the function . . . .

*Id.* § 1630.2(n)(3); *see also Wells v. Shalala*, 228 F.3d 1137, 1144 (10th Cir. 2000) (citing § 1630.2(n)(3) to determine whether a function is essential under the Rehabilitation Act).

ii. Establishing essential functions

"Courts require an employer to come forward with evidence concerning whether a job requirement is an essential function." *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 889 (10th Cir. 2015); *see also* Laura Rothstein & Julia Irzyk, *Disabilities and the Law* § 4:11 (4th ed., Oct. 2020 update) ("The employer will generally bear the burden of demonstrating that requirements are fundamental or essential and are not marginal functions."). To do so, "[t]he employer describes the job and functions required to perform that job." *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004). At that point, "our disability-discrimination caselaw . . . counsels in favor of deference to an employer's judgment concerning essential functions." *Hawkins*, 778 F.3d at 884-85. "We will not second guess the employer's judgment when its description is job-related, uniformly enforced, and consistent with business necessity." *Mason*, 357 F.3d at 1119. "Once the employer has come forward with evidence that a job function or requirement is essential, the plaintiff bears the burden to dispute that evidence or otherwise show that the function or requirement is nonessential." *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1222 (10th Cir. 2016). "Throughout this inquiry, the plaintiff bears the burden of showing she is able to perform the essential functions of her job." *Osborne*, 798 F.3d at 1267 (brackets and quotations omitted).[7]

---

[7] Although the employer bears the initial burden of production regarding essential functions, "the *plaintiff at all times bears the ultimate burden of persuading* the trier of fact that he has been the victim of illegal discrimination based on his disability." *Hawkins*, 778 F.3d at 887.

13

b. *Application*

The essential functions of the CO position encompass a broad range of physical tasks. Mr. Mannan could not perform these functions.

i. Correctional Officer essential functions

The essential functions of a CO include the ability to respond to emergency situations, like riots, and to control inmates physically. Performing these tasks requires the ability to ambulate and exert significant force. Factors to determine whether a function is essential—including the employer's judgment, job descriptions, the time dedicated to the function, and the consequences of failing to perform the function—support this conclusion. *See* 29 C.F.R. § 1630.2(n)(3).

First, CDOC views these functions as essential. Warden Long described the ability to defend oneself as a "critical function" for COs. *See* App., Vol. 2 at 180; *see also* 29 C.F.R. § 1630.2(n)(3)(i). Second, CDOC describes such functions as "essential" in its "position description" and job analysis. *See* App., Vol. 1 at 93, 114-15, 119 (capitalization altered); *see also* 29 C.F.R. § 1630.2(n)(3)(ii). Third, COs spend about a third of their time engaged in such tasks. *See* App., Vol. 1 at 114; *see also* 29 C.F.R. § 1630.2(n)(3)(iii). Fourth, the consequences of failing to perform these functions can be dire. The "position exists . . . to [m]aintain safety and security," App., Vol. 1 at 114, and violence in the DRDC—both against prisoners and staff—occurs relatively frequently, *see id.* at 88; *see also* 29 C.F.R. § 1630.2(n)(3)(iv).

14

Mr. Mannan argues the essential functions of his job were not those of a CO generally, but rather those of a CO working in the control room. But *Martin v. Kansas*, 190 F.3d 1120 (10th Cir. 1999),[8] forecloses this argument. There, the CO, Mr. Martin, suffered from arthritis, which limited his physical activities. *See id.* at 1124-25. He was assigned to "tower duty," *see id.* at 1124, where he conducted surveillance, communicated with others in the prison, checked equipment, and kept records, *see id.* at 1130—not physically demanding tasks.

Mr. Martin argued the essential functions applicable to him were the "limited responsibilities of his tower duty post." *Id.* The State "contend[ed] that the essential functions of [his] job included the broad list of duties required of all" COs. *Id.* These duties included "the job requirements set forth in the written position description and the rotation policy," as well as physical requirements like being able stand, walk, and "physically restrain persons in custody." *Id.* We held "the essential functions of [a CO's] job were those broader functions of a corrections officer position, as opposed to the limited duties of a particular post." *Id.* at 1132.[9]

---

[8] *Overruled on other grounds by Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001), *as recognized in Rivero v. Bd. of Regents of Univ. of N.M.*, 950 F.3d 754 (10th Cir. 2020).

[9] Other circuits agree. *See Faulkner v. Douglas Cnty.*, 906 F.3d 728, 733-34 (8th Cir. 2018); *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 726-28 (6th Cir. 2000); *Kees v. Wallenstein*, 161 F.3d 1196, 1199 (9th Cir. 1998); *Miller v. Ill. Dep't of Corr.*, 107 F.3d 483, 485 (7th Cir. 1997).

15

As in *Martin*, the essential functions for Mr. Mannan were not the narrow duties of the control room, but rather the broader duties of a CO. Even COs working in the control room performed the physical tasks of the position, like responding to emergencies. For instance, COs "in the [DRDC's] housing unit's control center have been forced to defend in place, or to evacuate their posts by exiting either onto a roof or through the offender occupied common areas for egress." App., Vol. 1 at 87.

ii. Mr. Mannan's ability to perform the essential functions

When determining whether an individual could perform the essential functions of his job, we look to the time of the employment action at issue. *See Frazier*, 254 F.3d at 1256. Mr. Mannan's claims potentially encompass both Warden Long's (1) removing him from transitional duty in the control room in August 2017 and (2) terminating him in March 2018. Mr. Mannan was unable to perform the job's essential functions at both times.

In August 2017, Mr. Mannan's work restrictions while on transitional duty limited him to standing and walking for short periods of time, limitations that were incompatible with the essential functions of a CO. Indeed, Mr. Mannan could not even perform all the functions of a control room operator—other COs in the control room had to perform his "nonsedentary" tasks. *See* App., Vol. 2 at 222-23.

In March 2018, Mr. Mannan's work restrictions were even greater and therefore incompatible with the essential functions of a CO.

16

2. **Reasonable Accommodation**

Because Mr. Mannan could not perform the essential functions of his job, we turn to the second step of the "otherwise qualified individual" inquiry—whether a reasonable accommodation existed. Mr. Mannan cannot show that CDOC could have provided a reasonable accommodation that would have allowed him to perform the essential functions of his job.

a. *Additional legal background*

i. Definition

"[T]he term 'reasonable accommodation' refers to those accommodations which presently, or in the near future, enable the employee to perform the essential functions of his job." *Aubrey v. Koppes*, 975 F.3d 995, 1007 (10th Cir. 2020) (quotations omitted); *see also* 29 C.F.R. § 1630.2(o)(1)(ii) (defining reasonable accommodations as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position").

Reasonable accommodations "may include":

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B); *see also* 29 C.F.R. § 1630.2(o)(2).

17

ii. Establishing reasonable accommodation

Courts recognize a three-step "burden-shifting framework" for determining whether an accommodation is reasonable:

> First, the employee need only show that an accommodation seems reasonable on its face, *i.e.*, ordinarily or in the run of cases. A proposed accommodation is not reasonable on its face if it would not enable the employee to perform the essential function at issue.
>
> Second, if the employee presents a facially reasonable accommodation, the burden of production then shifts to the employer to present evidence of its inability to accommodate. The employer must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.
>
> Third, if the employer presents such evidence, the employee has the burden of coming forward with evidence concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence. As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that he has been the victim of illegal discrimination based on his disability.

*Osborne*, 798 F.3d at 1267-68 (brackets, quotations, footnotes, and citations omitted).

Here, the parties contest whether Mr. Mannan can satisfy the first step—showing a facially reasonable accommodation.

iii. Facial reasonableness

"A proposed accommodation is not reasonable on its face if it would not enable the employee to perform the essential function at issue." *Id.* at 1267; *see also Adair v. City of Muskogee*, 823 F.3d 1297, 1311 (10th Cir. 2016) ("We have consistently held that

18

an employee's request to be relieved from an essential function of his position is not, as a matter of law, a reasonable or even plausible accommodation." (brackets, ellipsis, and quotations omitted)); *Frazier*, 254 F.3d at 1261 ("Although job restructuring is a possible accommodation . . . , an accommodation that eliminates the essential function of the job is not reasonable." (brackets and quotations omitted)). "Simply put, an employer need not modify an essential function of an existing position in order to accommodate a disabled employee." *Adair*, 823 F.3d at 1311 (quotations omitted).

This rule is not absolute. For example, although "[a]ttendance is generally an 'essential' function of any job," an employee's taking leave may serve as a reasonable accommodation if doing so would enable the employee to perform the job's essential functions in the near future. *See Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000).[10] For such leave to be reasonable, (1) "[t]he employee must provide the employer an estimated date when she can resume her essential duties," and (2) "[a] leave request must assure an employer that an employee can perform the essential functions of her position in the 'near future.'" *Robert*, 691 F.3d at 1218 (quoting *Cisneros*, 226 F.3d at 1129).

---

[10] *Overruled on other grounds by Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001), *as recognized in Robert v. Bd. of Cnty. Comm'rs of Brown Cnty.*, 691 F.3d 1211 (10th Cir. 2012).

19

b. *Application*

Mr. Mannan argues that CDOC could have accommodated his disability by extending his transitional duty in the control room.[11]  But he cannot show this accommodation is facially reasonable.

Mr. Mannan's essential functions were those of a CO, not his tasks when temporarily assigned to the control room.[12]  An assignment that would relieve him from performing his essential functions as a CO is not reasonable as a matter of law.  *See Adair*, 823 F.3d at 1311; *Osborne*, 798 F.3d at 1267.

Mr. Mannan argues that "[b]y placing [him] in the [control room] for a month, . . . [CDOC] showed that it could reasonably accommodate [him]" there.  *See* Aplt. Br. at 15. Although CDOC provided Mr. Mannan a transitional duty assignment to the control room, that does not mean a more permanent assignment there would have been a reasonable accommodation.  The transitional duty assignment may have provided a more generous accommodation than the Rehabilitation Act requires to be "reasonable."  *See*

---

[11] In his complaint, Mr. Mannan also referenced the reassignment to an open dispatcher job as a reasonable accommodation.  But Mr. Mannan does not raise that argument in his briefs.  In any event, given Mr. Mannan's pay grade, reassignment to this position would have been a promotion, *see* App., Vol. 1 at 132, and an employer is "not require[d] . . . to promote a disabled employee as an accommodation," *White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir. 1995).

[12] Insofar as Mr. Mannan asked to be reassigned to a permanent job in the control room, no such position exists.  COs rotate through the control room.  And "[i]t is not reasonable to require an employer to create a new job for the purpose of reassigning an employee to that job." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1174 (10th Cir. 1999) (en banc).

*Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1528 (11th Cir. 1997) (noting that the

defendant's "previous accommodation may have exceeded that which the law requires").

Extending his assignment to the control room would have been an "accommodation that

eliminates an essential function of a job." *See Hancock v. Wash. Hosp. Ctr.*, 13 F. Supp.

3d 1, 6 (D.D.C. 2014), *aff'd*, 618 F. App'x 4 (D.C. Cir. 2015) (per curiam) (unpublished).

"[E]ven if the employer voluntarily provided such an accommodation in the past," it

remains "unreasonable." *Id.*[13] Thus, CDOC's temporary assignment of Mr. Mannan to

the control room in July 2017 did not require CDOC to extend his assignment there.

Mr. Mannan also suggests that such an accommodation would have been

reasonable because he could have performed the essential functions of a CO in the near

future. He relies on our case law recognizing that leave itself can be a reasonable

accommodation. But Mr. Mannan fails to identify any authority expanding this case law

to require extension of his transitional duty.[14]

In any event, Mr. Mannan failed to meet the requirements to avail himself of a

temporary leave accommodation. He did not provide an estimated date for his resuming

the essential functions of a CO. *See Robert*, 691 F.3d at 1218. Rather, he repeatedly

---

[13] The First, Third, Seventh, and Eleventh Circuits agree. *See Phelps v. Optima Health, Inc.*, 251 F.3d 21, 26 (1st Cir. 2001); *Walton v. Mental Health Ass'n. of Se. Pa.*, 168 F.3d 661, 671 (3rd Cir. 1999); *Basith v. Cook Cnty.*, 241 F.3d 919, 930 (7th Cir. 2001); *Holbrook*, 112 F.3d at 1528.

[14] Even though CDOC did not continue Mr. Mannan's transitional duty, it allowed him to take leave for several months.

21

delayed having the surgery that may have restored his ability to perform the essential functions. More than six months passed from his removal from transitional duty in August 2017 to his termination in March 2018 without undergoing surgery. *See Hwang v. Kan. State Univ.*, 753 F.3d 1159, 1163 (10th Cir. 2014) ("[H]olding onto a non-performing employee for six months just isn't something the Rehabilitation Act ordinarily compels.").

Finally, Mr. Mannan argues that other officers received transitional assignments in the control room for more than a month, suggesting a longer assignment for him would have been a reasonable accommodation. But Mr. Mannan has not shown that those who received these transitional assignments were similarly situated to him. *See Garvey v. Sullivan*, 773 F. App'x 634, 637 (2d Cir. 2019) (unpublished) (rejecting plaintiff's argument that "his requested accommodation is consistent with Defendants' admitted past practices" regarding "light duty assignments" for police officers—and thus reasonable—where the "instances involving other officers were not comparable" (quotations omitted));[15] *see also Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1318 (10th Cir. 2017) (holding that a similarly situated claim must have evidentiary support). Even if he could, his argument still fails because an employer's willingness to provide employees with an accommodation that relieves them of performing essential functions does not

---

[15] Although not precedential within either the Tenth Circuit or the Second Circuit, *see* 2d Cir. R. 32.1.1(a), we find this reasoning persuasive and cite the case for its persuasive value, *see* 10th Cir. R. 32.1; 2d Cir. R. 32.1.1(b)(1); *see also* Fed. R. App. P. 32.1.

make the accommodation "reasonable." *See Hancock*, 13 F. Supp. 3d at 6; *Garvey*, 773 F. App'x at 637 ("[E]ven assuming that . . . other employees were similarly situated to [the plaintiff], prior assignment of temporary light-duty work to other disabled employees does not constitute an admission that such light-duty work is a reasonable accommodation . . . .").[16]

### III.  CONCLUSION

We affirm the district court's judgment.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge

---

[16] Mr. Mannan also argues the State's motion for summary judgment should fail because CDOC "failed in its duty to participate in the interactive process." *See* Aplt. Br. at 35.  But because Mr. Mannan has not shown that CDOC could provide him with a reasonable accommodation, CDOC was not obligated to engage in an interactive process. *See Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010) (affirming summary judgment under the Rehabilitation Act for an employer "although there was not a face-to-face meeting between the parties to discuss accommodations" when "it was reasonable for the [employer] to conclude that any further interactive process would be futile and that no reasonable accommodation was possible"); *Mason*, 357 F.3d at 1124 n.4 (stating that an employer is "not required to engage in the interactive process" when an employee is "not a qualified individual"); *Smith*, 180 F.3d at 1174 ("Even if [an employer] failed to fulfill its interactive obligations . . . , [an employee] will not be entitled to recovery unless he can also show that a reasonable accommodation was possible . . . .").